# COUNSELMAN *v.* HITCHCOCK.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF ILLINOIS.

No. 1026. Argued December 9, 10, 1891. — Decided January 11, 1892.

Under the 5th Amendment to the Constitution of the United States, which
declares that " no person . . . shall be compelled in any criminal
case to be a witness against himself," where a person is under examina-
tion before a grand jury, in an investigation into certain alleged viola-
tions of the interstate commerce act of February 4, 1887, 24 Stat. 379,
and the amendatory act of March 2, 1889, 25 Stat. 855, he is not obliged
to answer questions where he states that his answers might tend to
criminate him, although § 860 of the Revised Statutes provides that no
evidence given by him shall be in any manner used against him, in any
court of the United States, in any criminal proceeding.

The case before the grand jury was a criminal case.

The meaning of the constitutional provision is not merely that a person
shall not be compelled to be a witness against himself 'in a criminal
prosecution against himself; but its object is to insure that a person
shall not be compelled, when acting as a witness in any investigation, to
give testimony which may tend to show that he himself has committed
a crime.

The ruling in *People* v. *Kelly*, 24 N. Y. 74, that the words " criminal case "
mean only a criminal prosecution against the witness himself, disapproved.

The protection afforded by § 860 is not co-extensive with the constitutional
provision.

Adjudged cases on this subject, in courts of the United States, and of the
States, reviewed.

As the manifest purpose of the constitutional provisions, both of the States
and of the United States, is to prohibit the compelling of testimony of a
self-criminating kind from a party or a witness, the liberal construction
which must be placed on constitutional provisions for the protection of
personal rights, would seem to require that the constitutional guaranties,
however differently worded, should have as far as possible the same
interpretation.

It is a reasonable construction of the constitutional provision, that the
witness is protected from being compelled to disclose the circumstances
of his offence, or the sources from which, or the means by which, evi-
dence of its commission, or of his connection with it, may be obtained,
or made effectual for his conviction, without using his answers as direct
admissions against him.

No statute which leaves the party or witness subject to prosecution, after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the constitution.

In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates.

The witness, having been committed to custody for his refusal to answer, is entitled to be discharged on *habeas corpus*.

On the 21st of November, 1890, while the grand jury in attendance upon the District Court of the United States for the Northern District of Illinois was engaged in investigating and inquiring into certain alleged violations, in that district, of an act of Congress entitled " An act to regulate commerce," approved February 4, 1887, c. 104; 24 Stat. 379, and the amendments thereto, approved March 2, 1889, c. 382, 25 Stat. 855, by the officers and agents of the Chicago, Rock Island and Pacific Railway Company, and by the officers and agents of the Chicago, St. Paul and Kansas City Railway Company, and by the officers and agents of the Chicago, Burlington and Quincy Railroad Company, and the officers and agents of various other railroad companies having lines of road in that district, one Charles Counselman appeared before the grand jury, in response to a subpœna served upon him, and after having been duly sworn, testified as follows :

" Q. Your name is Charles Counselman ?

" A. Yes, sir.

" Q. You are the sole member of Charles Counselman & Co. ?

" A. Yes, sir.

" Q. Engaged in the grain and commission business in the city of Chicago ?

" A. Yes, sir.

" Q. Have you been a receiver of grain from the West during the past two years ?

" A. Yes, sir.

" Q. Over what roads did you ship grain received by you during the present summer of 1890 ?

" A. The Rock Island and Burlington, principally.

" Q. From what States was most of the grain shipped ?

" A. From Kansas and Nebraska, I think.

" Q. What did your receipts in bushels amount to of corn in the months of May, June and July, 1890 ?

" A. I have no idea; I could not tell you.

" Q. Five hundred thousand bushels a month ?

" A. I cannot tell you.

" Q. How many men have you employed during the last year ? What is the usual number of men employed in connection with your business ?

" A. I have, I think, six or seven men in my office.

" Q. Have you during the past year, Mr. Counselman, obtained a rate for the transportation of your grain on any of the railroads coming to Chicago, from points outside of this State, less than the tariff or open rate ?

" A. That I decline to answer, Mr. Milchrist, on the ground that it might tend to criminate me.

" Q. During the past year have you received rates upon the Chicago, Rock Island and Pacific from points outside of the State to the city of Chicago, at less than the tariff rates ?

" A. That I decline to answer on the same ground.

" Q. I will ask you the same question with reference to the Burlington.

" A. I answer in the same way.

" Q. The same with reference to Atchison.

" A. I can't recollect that we have done any business with that road.

" Q. I will ask you whether you have during the last year received a rate less than the tariff rate on what is called the ' Diagonal ' or Stickney road ?

" A. Not to my knowledge.

" Q. Who attends to the freight department of your business ?

" A. Myself and Mr. Martin.

" Q. Have you or the firm of Charles Counselman & Co. received any rebate, drawback or commission from the Chicago, Rock Island and Pacific Railroad Company, or the Chicago, Burlington and Quincy Railroad Company, on the transportation of grain from points in the States of Nebraska

and Kansas, to the city of Chicago, in the State of Illinois, during the past year, whereby you secured the transportation of said grain at less than the tariff rates established by said railroad?

" A. I decline to answer on the same ground."

The grand jurors thereupon filed in said court, on the 22d of November, 1890, their report, signed by their foreman and clerk, certifying to the court the several questions which Counselman so refused to answer. Thereupon, the judge of the court granted a rule on Counselman to show cause why he should not answer the said questions, a hearing was had; and the court made an order, on the 25th of November, 1890, which found that the excuses and reasons advanced on behalf of Counselman, as to why he should not answer said questions, were wholly insufficient, and directed that he appear before the grand jury without delay, and there answer the said questions, and also such further questions touching the matter under inquiry by the grand jury, and which should be pertinent to such inquiry, as should be propounded to him by any member of the grand jury, or the district attorney, or any of his assistants.

Counselman was again called before the grand jury, and the same questions, together with other kindred questions, were submitted to him to answer; and he refused to answer them and each of them, for the same reasons. The grand jury, by its report, signed by its foreman and clerk, reported to the court that Counselman still refused to answer the questions which he had previously refused to answer, and upon the same grounds, and that there were also propounded to him by the district attorney and the grand jury additional questions, which, and the answers thereto, were as follows:

" Q. Do you know whether or not the Chicago, Rock Island and Pacific Railroad Company transported for any person, company or corporation in the city of Chicago, during the year last past, grain from any point in the States of Nebraska, Kansas or Iowa, to the city of Chicago, in the State of Illinois, for less than the established rates in force on such road at the time of such transportation?

"A. I decline to answer, on the ground that my answer might tend to criminate me.

"Q. Do you know any person, corporation or company who has obtained their transportation of grain from points or places in the States of Iowa, Nebraska or Kansas, to the city of Chicago, over the Chicago, Rock Island and Pacific Railroad, during the past year, at a rate and price less than the published and legal tariff rate at the time of such shipment?

"A. I decline to answer for the reason that my answer might tend to criminate me.

"Q. Do you know whether the Chicago, Rock Island and Pacific Railroad Company, within the past year, has charged, demanded or received from any person, company or corporation in the city of Chicago any less rate than the open rate, or rate established by said railroad company, on grain or other property transported by the said railroad company from points in the States of Nebraska, Kansas and Iowa, to the city of Chicago, in the State of Illinois? If you have such knowledge, give the name of such shipper of whom said rate was charged, demanded or received, and the amount of such rate and shipments, stating fully all the particulars within your knowledge.

"A. I decline to answer, for the reason that my answer might tend to criminate me.

"Q. Do you know whether the Chicago, Rock Island and Pacific Railroad Company, during the year A.D. 1890, has paid to any shipper, at the City of Chicago, any rebate, refund or commission on property and grain transported by such company from points in the States of Kansas, Nebraska or Iowa, whereby such shipper obtained the transportation of such grain or property from the said points in said States to the city of Chicago, in the State of Illinois, at a less rate than the open or tariff rate, or the rate established by said company? If you have such knowledge, state the amount of such rebates, the drawbacks, or commissions paid, to whom paid, the date of the same, and on what shipments; and state fully all the particulars within your knowledge relating to such transaction or transactions.

"A. I decline to answer, for the reason that my answer might tend to criminate me."

Thereupon, after a hearing, the court on November 25, 1890, adjudged Counselman to be in contempt of court, and made an order fining him $500 and the costs of the proceeding, and directing the marshal to take him into custody and hold him until he should have answered said questions, and all questions of similar import which should be propounded to him by the grand jury, or the district attorney, or any assistant district attorney, in the presence of such jury, and until he should pay such fine and costs. Under that order he was taken into custody by the marshal and held.

On the 26th of November, 1890, he filed in the Circuit Court of the United States for the Northern District of Illinois a petition setting forth the foregoing facts, and praying for a writ of *habeas corpus.* The petition alleged that the grand jury had no jurisdiction or authority to make the investigation in question, or to submit to him the several questions referred to; that his answers to those questions would tend to incriminate him, and, by compelling him to answer them, he would be compelled to be a witness against himself in the criminal proceeding and investigation pending before the grand jury, and in any criminal proceedings which might be brought as a result of such investigation, contrary to the provisions of the Constitution of the United States, and especially the Fourth and Fifth Amendments thereof; that the District Court had no jurisdiction to compel him to answer said questions; that its order to that effect was contrary to the Constitution and laws of the United States, and was void; that the District Court had no jurisdiction so to adjudge him in contempt; that the order imposing a fine upon him and committing him to the custody of the marshal was void; and that he was held in custody without legal right, and contrary to the Constitution and laws of the United States.

On the same day, the Circuit Court issued a writ of *habeas corpus*, returnable forthwith, the return to which by the marshal was that Counselman was held under the order of the District Court, made November 25, 1890. The case was heard

on November 28, and on December 18, the Circuit Court, held by Judge Gresham, delivered an opinion, (44 Fed. Rep. 268,) and made an order adjudging that the District Court was in the exercise of its rightful authority in doing what it had done, overruling the motion of Counselman for his discharge, dismissing his petition, remanding him to the custody of the marshal, discharging the writ of *habeas corpus*, and adjudging against Counselman the costs of the proceedings. He excepted to the order and appealed to this court, and an order was made admitting him to bail pending the appeal.

*Mr. John N. Jewett* and *Mr. James C. Carter* for appellant.

*Mr. Assistant Attorney General Parker* and *Mr. G. M. Lambertson* for appellee.

I. If the record is silent as to jurisdictional facts, the court will presume jurisdiction to exist if the grand jury could, under any circumstances, investigate the class of crimes under consideration. In a collateral attack on a judgment of the United States courts, jurisdiction is presumed, although in a proceeding by error the judgment would be overthrown. *Skillern's Executors* v. *May's Executors*, 6 Cranch, 267; *McCormick* v. *Sullivant*, 10 Wheat. 192; *In re Cuddy*, 131 U. S. 280; *Galpin* v. *Page*, 18 Wall. 350; *Kempe* v. *Kennedy*, 5 Cranch, 173; *Ex parte Bigelow*, 113 U. S. 328.

The appellant having alleged a total want of jurisdiction, must prove it. The truth of the allegation cannot be left to surmise or presumption. Appellants have offered no proof. This Court has gone so far as to say that a judgment is valid as against a collateral attack, although it affirmatively appears that the court is without jurisdiction. *Des Moines Nav. Co.* v. *Iowa Homestead Co.*, 128 U. S. 552, 557.

II. A witness is not entitled to plead the privilege of silence except " in a criminal case " against himself. It will be observed that the common law rule extends a broader privilege to the witness than the words of the Constitution. By the common law a witness in any case in any court was entitled

to refuse to answer where the answer would have a tendency to criminate him. The common law rule was embodied in 14 and 15 Vict. c. 99, § 3: "Nothing therein contained shall render any person who in any criminal proceeding is charged with the commission of any indictable offence, or any offence punishable on summary conviction, competent or compellable, to give evidence for or against himself or herself, or shall render any person compellable to answer any question tending to criminate himself or herself."

III. Congress, in submitting the clause of the Fifth Amendment to the Constitution, intended to limit and qualify the common law rule. That part of the Fifth Amendment discussed here, was originally proposed by Mr. Madison in the following language, and stood in this connection: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence, nor shall be compelled to be a witness against himself, nor be deprived of life, liberty or property without due process of law."

The debates upon this clause show that it was objected to because it "contained a general declaration in some degree contrary to laws passed, the member objecting alluding to that part where a person shall not be compelled to give evidence against himself. He thought it ought to be confined to criminal cases, and moved an amendment to that purpose, which amendment being adopted, the clause as amended was unanimously agreed to." Annals of Congress, vol. 1, p. 782; *United States* v. *Three Tons of Coal,* 6 Bissell, 387. It is therefore apparent that the clause in the Constitution limits and qualifies the common law rule. It is only "in a criminal case" that a witness can refuse to answer.

An investigation before a grand jury is in no sense "a criminal case." The inquiry is for the purpose of finding whether a crime has been committed, and whether any one shall be accused of an offence. The inquiry is secret; there is no accuser, no parties, plaintiff or defendant. The whole proceeding is *ex parte*, the testimony being confined to one side, and the evidence adduced is not governed by the rules or the manner or method by which testimony is adduced or admitted

on the trial of cases in court. Such an investigation is not a criminal case within the meaning of the Constitution. *United States* v. *Reed*, 2 Blatchford, 435, 464. See also *People* v. *Kelly*, 24 N. Y. 74; *United States* v. *Brown*, 1 Sawyer, 531, 535.

IV. Section 860 of the Revised Statutes takes away from the witness the right to refuse to answer on the ground that such answer might tend to criminate him. That section is as follows: "No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture: *Provided*, That this section shall not exempt any party or witness from prosecution and punishment for perjury committed in discovering or testifying as aforesaid."

This section is taken from the act of February 25, 1868, 15 Stat. 37, c. 13, entitled "An Act for the Protection in certain Cases of Persons making Disclosures as Parties, or testifying as Witnesses." Before its passage voluntary admissions were always admissible in evidence against an accused. The Fifth Amendment sought only to preclude the use of involuntary testimony, while the act in terms excludes both voluntary and involuntary admissions. Thus, instead of invading, it adds to the guaranties of the Constitution, and is a new safeguard for individual rights and liberties.

The remarks in the senate upon it throw light upon its purposes. Mr. Frelinghuysen, in introducing the bill, said: "The object of the bill is to relieve parties in making disclosures and witnesses testifying from subjecting themselves to forfeitures and penalties. The government finds it necessary that some such bill should be passed, as where they seek a disclosure parties plead the fact that it will subject them to forfeitures and penalties, and so the government is debarred from getting such evidence as it is essential for it to have. It only applies to courts of the United States." Mr. Trumbull, in the course of the debates, said: "This bill proposes that he [the witness] shall not be excused from testifying on the

ground that the answer might be used against him in a penal proceeding or a criminal proceeding. Of course the court would compel him to answer if it was a proper case." And Mr. Garrett Davis said : " I understand the bill is based upon the common law principle that no man should be compelled to give evidence against himself in criminal and penal cases. I hold that this is the intention upon which this bill has been introduced. I understand the immunity which it gives to an individual is this, that when he is compelled to make a disclosure in giving evidence, or in written pleadings, where he is compelled by the law and the words of the proceeding in court to give evidence involuntarily, any disclosure he makes shall not be used against him in any criminal or penal prosecution or any suit that is quasi penal. That is a correct principle. It is one that has been embodied in the laws of Kentucky, with which I am familiar, for a great many years, and I think the provision of this bill is a very proper one."

It is claimed that the statute only applies to voluntary admissions given in *civil cases.* There is certainly nothing in the language of the act to sustain this assertion. What warrant is there for limiting those words to civil actions? We might with as much reason argue that the act was only intended to apply to criminal proceedings. If Congress intended to limit the act to disclosures and evidence obtained in civil causes it would have been very careful to say so, and would not have used the words "judicial proceeding."

In several cases in the Federal courts this statute has been construed as holding that the witness is not protected by the Constitution from being compelled to give testimony called for, though it might implicate him in a crime, as he is fully protected by statute against the use of such testimony on his trial. *United States* v. *Brown,* 1 Sawyer, 531; *United States* v. *McCarthy,* 18 Fed. Rep. 87; *United States* v. *Three Tons of Coal,* 6 Bissell, 379; *In re Counselman,* 44 Fed. Rep. 268.

In several of the state courts similar provisions in state constitutions and state legislation have received a similar construction.

The constitution of the State of New York is identical with

the clause under consideration in the Fifth Amendment to the Constitution of the United States. The legislature of that State enacted that "Every person offending against either of the preceding sections of this article shall be a competent witness against any other person so offending, and may be compelled to offer and give evidence before any magistrate or grand jury, or in any court, in the same manner as other persons, but the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying." The court of appeals held that the witness "was not protected by the Constitution from answering before the grand jury." *People* v. *Kelly*, 24 N. Y. 74. This ruling was affirmed in *People* v. *Sharp*, 107 N. Y. 427.

Like decisions have been made in Arkansas, *State* v. *Quarles*, 13 Arkansas, 307; in Indiana, *Wilkins* v. *Malone*, 14 Indiana, 153, and *Bidgood* v. *The State*, 115 Indiana, 275; in North Carolina, *La Fontaine* v. *Southern University*, 83 Nor. Car. 132; in California, *Ex parte Rowe*, 7 California, 184; and in Georgia, *Higdon* v. *Heard*, 14 Georgia, 255.

Decisions in other state courts are cited in support of the contention that the indemnity statute is not co-extensive with the Fifth Amendment of the Constitution because it does not grant the witness complete immunity. These decisions are — in Massachusetts, *Emery's Case*, 107 Mass. 172; in New Hampshire, *State* v. *Nowell*, 58 N. H. 314; in Virginia, *Cullen* v. *Commonwealth*, 24 Grattan, 624. An examination will show that these decisions are not in point, as they are based upon the phraseology of constitutions different from that of the Fifth Amendment.

In Massachusetts the constitution provided that "No subject shall be held to answer for any crimes or offences until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse or furnish evidence against himself." The exonerating statute was as follows: "But the testimony of any witness examined before said committee upon the subject aforesaid, or any statement made, or paper produced by him upon such examination, shall not be used as evidence against such witness in any civil or criminal proceed-

ing in any court of justice : Provided, however, that no official paper or record produced by such witness on such examination. shall be held or taken to be included within the privilege of said evidence so as to protect such witness in any civil or criminal proceeding aforesaid."

In New Hampshire the provision in the bill of rights is identical with that of Massachusetts. The statute of indemnity provides that " no clerk, servant or agent of any person accused of a violation of this chapter shall be excused from testifying against his principal for the reason that it may thereby criminate himself; but no testimony so given by him. shall in any prosecution be used as evidence, either directly or indirectly, against him ; nor shall he be thereafter prosecuted for any offence so disclosed by him."

In *Cullen* v. *Commonwealth* the decision is based on the language of the eighth clause of the constitution of Virginia: " Nor can he be compelled to give evidence against himself."

V. The witness does not claim his privilege on the ground that he may furnish clews and give the names of witnesses that may lead to his conviction on testimony other than his own, but declines on the ground that his *answer* if repeated may criminate him. But the claim that the witness may uncover clews and furnish the names of witnesses that may assist the government to convict him of a crime is not within the privilege. Archbold Crim. Prac. & Plead., 8th Am. ed. 399; 2 Hawk. Pl. Crown, Bk. 2, c. 46, § 38. In a note to Archbold, the rule is said to be as follows : Though some have thought otherwise, the later cases are uniform to the point that a circumstance tending to show guilt may be proved although it was brought to light by a declaration inadmissible *per se*, as having been obtained by improper influence. *Rex* v. *Wilson*, Holt N. P. 597, 598, note; *State* v. *Moore*, 1 Haywood (N. C.) 482.

VI. If the furnishing of clews or evidence by witnesses to be proved by independent witnesses is within the privilege, the act of February 25, 1868, Rev. Stat. § 860, is broad enough to protect the witness and exclude such evidence.

Appellant contends that this section is not broad enough to

support the requirement of giving evidence because it does not extend complete immunity to the accused. The enforcement of such a conclusion would nullify most investigations instituted under legislative authority. Absolute and complete indemnity would be equivalent to a pardon, and thus a legislative encroachment upon executive prerogative, and therefore void. Sen. Rep. No. 253, April 11, 1876, 44 Cong. 1st Sess.

If it shall be established that section 860 is ineffectual from lack of breadth and that a grant of absolute indemnity is void for the reason suggested, not only the law of 1868, and the similar provision in the act to regulate commerce between the States, but the law applicable to testimony given before committees of Congress and many valuable state enactments will be overthrown and injurious consequences will follow.

VII. If the Constitution had provided that any testimony of a witness or party or any information furnished by him should not be used or resorted to by the government to convict him, then its provisions would be as broad as the contention of counsel for appellant.

That the words " shall not be compelled to be a witness against himself " have no such extended significance is patent when we consider the purpose of this amendment, the causes which led to its adoption, and the mischief it sought to remedy.

Mr. Justice Blatchford, after stating the case, delivered the opinion of the court.

In the opinion of the Circuit Court, it was held that, under the Fifth Amendment to the Constitution, which declares that " no person . . . shall be compelled in any criminal case to be a witness against himself," a person cannot be compelled to disclose facts before a court or grand jury which might subject him to a criminal prosecution, or his property to forfeiture; that, under the Interstate Commerce Law, it is made a criminal offence, punishable by fine and imprisonment, for any officer or agent of a railroad company to grant any shippers of merchandise from one State to another, and for any such shipper to contract for or receive, a rate less than the tariff or open rate; that shippers, as well as the officers, agents

and employés of corporations engaged in the carrying business between States, are made subject to the penalties of the statute; but that, as the protection of § 860 of the Revised Statutes was co-extensive with that of the Constitution, Counselman was entitled to no privilege under the Constitution; that if thereafter he were to be prosecuted for the offence, § 860 would not permit his admissions to be proved against him; that his refusal to testify was not a refusal to testify in a proceeding to obtain evidence upon which he might be indicted, but in a proceeding to obtain evidence upon which others might be indicted; and that, although in his testimony he might disclose facts and circumstances which would open up sources of information to the government, whereby it might obtain evidence not otherwise obtainable to secure his conviction, yet, if his testimony could not be repeated in any subsequent proceeding against him or his property, he was protected as fully by § 860 as the Constitution intended he should be.

Section 860 is a reënactment of § 1 of the act of February 25, 1868, c. 13, 15 Stat. 37, which provided as follows: "That no answer or other pleading of any party, and no discovery or evidence obtained by means of any judicial proceeding from any party or witness' in this or any foreign country, shall be given in evidence, or in any manner used against such party or witness, or his property or estate, in any court of the United States, or in any proceeding by or before any officer of the United States, in respect to any crime, or for the enforcement of any penalty or forfeiture by reason of any act or omission of such party or witness: *Provided*, That nothing in this act shall be construed to exempt any party or witness from prosecution and punishment for perjury committed by him in discovering or testifying as aforesaid."

Section 860 provides as follows: "No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture: *Provided*, That this section

shall not exempt any party or witness from prosecution and punishment for perjury committed in discovering or testifying as aforesaid."

By § 10 of the Interstate Commerce Act, of February 4, 1887, c. 104, 24 Stat. 382, as amended by § 2 of the act of March 2, 1889, c. 382, 25 Stat. 857, unlawful discrimination in rates, fares or charges, for the transportation of passengers or property, is made subject not only to a fine of not to exceed $5000 for each offence, but to imprisonment in the penitentiary for not over two years, or to both, in the discretion of the court. By § 12 of the act of 1887, 24 Stat. 383, as amended by § 3 of the act of 1889, 25 Stat. 858, the Interstate Commerce Commission is authorized and required to execute and enforce the provisions of the act, and on the request of the commission, it is made the duty of any district attorney of the United States to whom the commission may apply, to institute in the proper court, and to prosecute under the direction of the Attorney General of the United States, all necessary proceedings for the enforcement of the provisions of the act and for the punishment of all violations thereof.

It is contended by the appellant that the grand jury of the District Court was not in the exercise of its proper and legitimate authority in prosecuting the investigations specifically set out in its two reports to the District Court; that those reports could not be made the foundation of any judicial action by the court; that the Interstate Commerce Commission was specially invested by the statute with the authority to investigate violations of the act and charged with that duty; and that no duty in that respect was imposed upon the grand jury, until specific charges had been made.

But in the view we take of this case, we do not find it necessary to intimate any opinion as to that question in any of its branches, or as to the question whether the reports of the grand jury, in stating that they were engaged in investigating and inquiring into "certains alleged violations" of the acts of 1887 and 1889 by the officers and agents of three specified railway and railroad companies, and the officers and agents of various other railroad companies having lines of road in the

district, (there being no other showing in the record as to what
they were investigating and inquiring into,) are or are not con-
sistent with the fact that they were investigating specific
charges against particular persons; because we are of opinion
that upon another ground the judgment of the court below
must be reversed.

It is broadly contended on the part of the appellee that a
witness is not entitled to plead the privilege of silence, except
in a criminal case against himself; but such is not the lan-
guage of the Constitution. Its provision is that no person
shall be compelled in *any* criminal case to be a witness against
himself. This provision must have a broad construction in
favor of the right which it was intended to secure. The mat-
ter under investigation by the grand jury in this case was a
criminal matter, to inquire whether there had been a criminal
violation of the Interstate Commerce Act. If Counselman
had been guilty of the matters inquired of in the questions
which he refused to answer, he himself was liable to criminal
prosecution under the act. The case before the grand jury
was, therefore, a criminal case. The reason given by Counsel-
man for his refusal to answer the questions was that his
answers might tend to criminate him, and showed that his
apprehension was that, if he answered the questions truly and
fully (as he was bound to do if he should answer them at all),
the answers might show that he had committed a crime
against the Interstate Commerce Act, for which he might
be prosecuted. His answers, therefore, would be testimony
against himself, and he would be compelled to give them in a
criminal case.

It is impossible that the meaning of the constitutional pro-
vision can only be, that a person shall not be compelled to be
a witness against himself in a criminal prosecution against him-
self. It would doubtless cover such cases; but it is not limited
to them. The object was to insure that a person should not be
compelled, when acting as a witness in any investigation, to
give testimony which might tend to show that he himself had
committed a crime. The privilege is limited to criminal mat-
ters, but it is as broad as the mischief against which it seeks
to guard.

It is argued for the appellee that the investigation before the grand jury was not a criminal case, but was solely for the purpose of finding out whether a crime had been committed, or whether any one should be accused of an offence, there being no accuser and no parties plaintiff or defendant, and that a case could arise only when an indictment should be returned. In support of this view reference is made to article 6 of the amendments to the Constitution of the United States, which provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury, to be confronted with the witnesses against him, to have compulsory process for witnesses, a d the assistance of counsel for his defence.

But this provision distinctly means a criminal prosecution against a person who is accused and who is to be tried by a petit jury. A criminal prosecution under article 6 of the amendments, is much narrower than a " criminal case," under article 5 of the amendments. It is entirely consistent with the language of article 5, that the privilege of not being a witness against himself is to be exercised in a proceeding before a grand jury.

We cannot yield our assent to the view taken on this subject by the Court of Appeals of New York, in *People* v. *Kelly,* 24 N. Y. 74, 84. The provision of the constitution of New York of 1846, (Art. 1, sec. 6,) was that no person shall "be compelled, in any criminal case, to be a witness against himself." The court, speaking by Judge Denio, said : " The term ' criminal case,' used in the clause, must be allowed some meaning, and none can be conceived other than a prosecution for a criminal offence. But it must be a prosecution against *him;* for what is forbidden is that he should be compelled to be a witness against himself." This ruling, which has been followed in some other cases, seems to us, as applied to the provision in the Fifth Amendment to the Constitution of the United States, to take away entirely its true meaning and its value.

It is an ancient principle of the law of evidence, that a witness shall not be compelled, in any proceeding, to make disclosures or to give testimony which will tend to criminate him or

subject him to, fines, penalties or forfeitures. *Rex* v. *Slaney*, 5 Carr. & P. 213 ; *Oates* v. *Hardacre*, 3 Taunt. 424 ; *Maloney* v. *Bartley*, 3 Camp. 210 ; 1 Starkie on Evidence, 71, 191 ; *Case of Sir John Freind*, 13 Howell's State Trials, 16 ; *Case of Earl of Macclesfield*, 16 Howell's State Trials, 767 ; 1 Greenl. Ev. § 451 ; 1 Burr's Trial, 244 ; Wharton's Crim. Ev. 9th ed. § 463 ; *Southard* v. *Rexford*, 6 Cowen, 254 ; *People* v. *Mather*, 4 Wend. 229 ; *Lister* v. *Boker*, 6 Blackford, 439.

The relations of Counselman to the subject of inquiry before the grand jury, as shown by the questions put to him, in connection with the provisions of the Interstate Commerce Act, entitled him to invoke the protection of the Constitution. *The State* v. *Nowell*, 58 N. H. 314 ; *Emery's Case*, 107 Mass. 172.

It remains to consider whether § 860 of the Revised Statutes removes the protection of the constitutional privilege of Counselman. That section must be construed as declaring that no evidence obtained from a witness by means of a judicial proceeding shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture. It follows, that any evidence which might have been obtained from Counselman by means of his examination before the grand jury could not be given in evidence or used against him or his property in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture. This, of course, protected him against the use of his testimony against him or his property in any prosecution against him or his property, in any criminal proceeding, in a court of the United States. But it had only that effect. It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted.

The constitutional provision distinctly declares that a person

shall not " be compelled in any criminal case to be a witness against himself;" and the protection of § 860 is not coextensive with the constitutional provision. Legislation cannot detract from the privilege afforded by the Constitution. It would be quite another thing if the Constitution had provided that no person shall be compelled in any criminal case to be a witness against himself, unless it should be provided by statute that criminating evidence extracted from a witness against his will should not be used against him. But a mere act of Congress cannot amend the Constitution, even if it should engraft thereon such a proviso.

In some States, where there is a like constitutional provision, it has been attempted by legislation to remove the constitutional provision, by declaring that there shall be no future criminal prosecution against the witness, thus making it impossible for the criminal charge against him ever to come under the cognizance of any court, or at least enabling him to plead the statute in absolute bar of such prosecution.

A review of the subject in adjudged cases will be useful.

In *Commonwealth* v. *Gibbs,* 3 Yeates, 429, and 4 Dall. 253, in 1802, the declaration of rights in the constitution of Pennsylvania of 1776, declared, that no man can " be compelled to give evidence against himself," and the same language was found in the constitution of 1790. Under this, the Supreme Court of Pennsylvania held that the maxim that no one is bound to accuse himself extended to cases where the answer might involve him in shame or reproach ; and it held to the same effect in *Lessee of Galbreath* v. *Eichelberger,* 3 Yeates, 515, in 1803.

In June, 1807, Chief Justice Marshall, in the Circuit Court of the United States for the District of Virginia, in *Burr's Trial,* 1 Burr's Trial, 244, on the question whether the witness was privileged not to accuse himself, said : " If the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath, that his answer would criminate himself, the

court can demand no other testimony of the fact. . . . According to their statement," (the counsel for the United States,) " a witness can never refuse to answer any question, unless that answer, unconnected with other testimony, would be sufficient to convict him of crime.. This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule, that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible, but a probable case, that a witness, by disclosing a single fact, may complete the testimony against himself; and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom, he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself, would most obviously be infringed, by compelling a witness to disclose a fact of this description. What testimony may be possessed, or is attainable, against any individual, the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws."

In 1853, in *State* v. *Quarles*, 13 Arkansas, 307, the declaration of rights in the constitution of Arkansas of 1836, (Art. 2, sec. 11,) had declared that in prosecutions by indictment or presentment, the accused "shall not be compelled to give evidence against himself." Quarles was indicted under a gaming law, for betting money on a game of chance. A *nolle prosequi* having been entered as to one Neal, against whom a like prosecution was pending, Neal was sworn as a witness for the State, and informed of the *nolle prosequi*, and that no indictment for a similar offence would be preferred against him, and was asked whether he had seen Quarles bet money at cards within a specified time. Neal refused to answer the

question, alleging that he feared that he would criminate himself thereby. The trial court refused to compel him to answer, and, the jury having found for the defendant, the State appealed. There was a statute of Arkansas which read as follows : " In all cases where two or more persons are jointly or otherwise concerned in the commission of any crime or misdemeanor, either of such persons may be sworn as a witness in relation to such crime or misdemeanor; but the testimony given by such witness shall in no instance be used against him in any criminal prosecution for the same offence."

The Supreme Court of Arkansas held, that, although witnesses were not expressed in the terms of the provisions of the bill of rights, yet they were substantially embraced to the full extent of a complete guarantee against self-accusation; and that the privilege of the bill of rights was that a witness should not be compelled to produce the evidence to prove himself guilty of the crime about which he might be called to testify. But it was further held that, by the statute, the legislature had so changed the rule, by directing that the testimony required to be given should never be used against a witness for the purpose of procuring his conviction for the crime or misdemeanor to which it related, that it was no longer necessary for him to claim his privilege in regard to such testimony, in order to prevent its afterwards being used against him; and that the only question was, whether the statutory regulation afforded sufficient protection to the witness, responsive to the new rule and to the constitutional guarantee against compulsory self-accusation. It was held, that the statute sufficiently guarded witnesses from self-accusation, within the meaning of the constitution, to make it lawful for the courts to compel them to testify as to all matters embraced by the provisions of the statute on that subject.

In *Higdon* v. *Heard*, 14 Georgia, 255, in 1853, it was said that the constitution of Georgia declared that " no person shall be compelled in any criminal case to be a witness against himself." In that case the plaintiff had filed a bill in equity praying a discovery as to property which he alleged the defendants had won from him in a game of cards. The bill

was demurred to on the ground that the law of the State compelling a discovery of gaming transactions was unconstitutional, because such transactions were criminal, and the statute did not grant an absolute and unconditional release from punishment, and because the defendants could not make the discovery sought without criminating themselves and incurring penalties. The demurrer was overruled by the Supreme Court of Georgia, on the ground that, although all persons were protected by the constitution from furnishing evidence against themselves which might tend to subject them to a criminal prosecution, they received their protection by virtue of an act of Georgia of 1764, because, under that act, their answers could not be read in evidence against them in any criminal case whatever, being excluded by the constitution.

In *Ex parte Rowe*, 7 California, 184, in 1857, the constitution of California of 1849 provided, (Art. 1, sec. 8,) that no person shall "be compelled, in any criminal case, to be a witness against himself." Rowe had been committed for refusing to answer, under an order of the court, certain questions propounded to him by the grand jury in an examination concerning the disposition of certain moneys taken from the state treasury, on the ground that his answer would disgrace him and would tend to subject him to a prosecution for felony. The Supreme Court of California, on *habeas corpus*, considered the construction and constitutionality of the 5th section of an act passed April 16, 1855, which provided that "the testimony given by such witness shall in no instance be used against himself in any criminal prosecution." The court held that the provision of the constitution was intended to protect the witness from being compelled to testify against himself in regard to a criminal offence; that he could not be a witness against himself unless his testimony could be used against him in his own case; and that the statute gave the witness that protection which was contemplated by the constitution, and therefore he was bound to answer.

In 1860, in *Wilkins* v. *Malone*, 14 Indiana, 153, the constitution of Indiana of 1851, in its bill of rights, (Art. 1, sec. 14,) had declared that "no person in any criminal prosecution shall be

compelled to testify against himself." In a suit brought by Malone to recover on a promissory note, the defence pleaded usury and offered to examine Malone as a witness to prove the usury. The plaintiff objected, on the ground that such examination would criminate himself, and the objection was sustained. On appeal to the Supreme Court of Indiana by the defendants, it was held that the constitutional provision protected a person from a compulsory disclosure, in a civil suit, of facts tending to criminate him, whenever his answer could be given in evidence against him in a subsequent criminal prosecution. The court referred to *State* v. *Quarles, supra,* and *Higdon* v. *Heard, supra,* and to the statute of Indiana, (1 Rev. Stats. p. 345, sec. 8,) which provided that a person charged with taking illegal interest might be required to answer, but that his answer should not be used against him in any criminal prosecution for usury. The court held that by this statute the constitutional privilege of the party was fully secured to him, although he might disclose circumstances which might lead to a criminal prosecution.

In 1861, in the Court of Appeals of New York, *People* v. *Kelly,* 24 N. Y. 74, the constitution of New York of 1846 declared, that no person shall " be compelled, in any criminal case, to be a witness against himself." In that case, one Hackley, as a witness before the grand jury on a complaint against certain aldermen for feloniously receiving a gift of money under an agreement that their votes should be influenced thereby in a matter then pending before them in their official capacity, in answer to a question put to him as to what he had done with certain money which he had received, said that any answer which he could give to the question would disgrace him, and would have a tendency to accuse him of a crime, and he demurred to the question. Having been ordered by the Court of General Sessions of the Peace to answer it, he still refused, and was adjudged guilty of contempt and put in prison. On a writ of *habeas corpus,* he was remanded into custody by the Supreme Court, and he appealed to the Court of Appeals.

By chapter 539 of the Laws of New York of 1853, it was

enacted, by § 2, that § 14 should be added to article 2, title 4, chapter 1, part 4, of the Revised Statutes. The act provided that the giving of money to any member of the common council of a city, with intent to influence his action upon any matter which might be brought before him in his official capacity, should be an offence punishable by fine or imprisonment in a state prison or both; and § 14 provided that every person offending against the statute should "be a competent witness against any other person so offending," and might be compelled to give evidence before any magistrate or grand jury, or in any court, in the same manner as other persons, "but the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying." A similar provision was contained in chapter 446 of the Laws of 1857, in § 52.

The Court of Appeals considered the question whether those provisions were consistent with the true sense of the declaration of the constitution, and said, speaking by Judge Denio (p. 82) : "The mandate that an accused person should not be compelled to give evidence against himself, would fail to secure the whole object intended, if a prosecutor might call an accomplice or confederate in a criminal offence, and afterwards use the evidence he might give to procure a conviction, on the trial of an indictment against him. If obliged to testify, on the trial of the coöffender, to matters which would show his own complicity, it might be said, upon a very liberal construction of the language, that he was compelled to give evidence against himself — that is, to give evidence which might be used in a criminal case against himself. . . . It is, of course, competent for the legislature to change any doctrine of the common law, but I think they could not compel a witness to testify, on the trial of another person, to facts which would prove himself guilty of a crime, without indemnifying him against the consequences, because I think, as has been mentioned, that by a legal construction the constitution would be found to forbid it." But the court went on to say: "If a man cannot give evidence upon the trial of another person without disclosing circumstances which will make his own

guilt apparent, or at least capable of proof, though his account
of the transactions should never be used as evidence, it is the
misfortune of his condition, and not any want of humanity in
the law. If a witness objects to a question on the ground that
an answer would criminate himself, he must allege, in sub-
stance, that his answer, if repeated as his admission, on his
own trial, would tend to prove him guilty of a criminal offence.
If the case is so situated that a repetition of it on a prosecu-
tion against him is impossible, as where it is forbidden by a
positive statute, I have seen no authority which holds or inti-
mates that the witness is privileged. It is not within any
reasonable construction of the language of the constitutional
provision. The term ' criminal case,' used in the clause, must
be allowed some meaning, and none can be conceived other
than a prosecution for a criminal offence. But it must be a
prosecution against *him;* for what is forbidden is that he
should be compelled to be a witness against himself. Now if
he be prosecuted criminally, touching the matter about which
he has testified upon the trial of another person, the statute
makes it impossible that his testimony given on that occasion
should be used by the prosecution on the trial. It cannot,
therefore, be said that in such criminal case he has been made
a witness against himself, by force of any compulsion used
towards him to procure, in the other case, testimony which
cannot possibly be used in the criminal case against himself."
The court held therefore, that Hackley was not protected by the
constitution of New York from answering before the grand jury.

In 1871, in *Emery's Case*, 107 Mass. 172, article 12 of the
declaration of rights in the constitution of Massachusetts of
1780 had declared, that no subject shall be "compelled to
accuse or furnish evidence against himself." A statute of
Massachusetts, of March 8, 1871, chapter 91, entitled " An act
for the better discovery of testimony and the protection of
witnesses before the joint special committee of the state police,"
provided as follows: " No person who is called as a witness
before the joint special committee on the state police, shall be
excused from answering any question or from the production
of any paper relating to any corrupt practice or improper

conduct of the state police, forming the subject of inquiry by such committee; on the ground that the answer to such question or the production of such paper may criminate or tend to criminate himself, or to disgrace him, or otherwise render him infamous, or on the ground of privilege; but the testimony of any witness examined before said committee upon the subject aforesaid or any statement made or paper produced by him upon such an examination, shall not be used as evidence against such witness in any civil or criminal proceeding in any court of justice; *provided, however*, that no official paper or record, produced by such witness on such examination, shall be held or taken to be included within the privilege of said evidence so to protect such witness in any civil or criminal proceeding as aforesaid, and that nothing in this act shall be construed to exempt any witness from prosecution and punishment for perjury committed by him in testifying as aforesaid."

Emery was summoned as a witness before the joint special committee of the senate and house of representatives of the general court " to inquire if the state police is guilty of bribery and corruption." Interrogatories were propounded to him by the committee which he declined to answer. On a report of the facts to the senate, it ordered his arrest for contempt. He was brought before the senate and asked the following question: " Are you ready and willing to answer before the joint special committee, appointed by this senate and the house of representatives of Massachusetts, to inquire if the state police is guilty of bribery and corruption, the following questions, namely: *First.* Whether, since the appointment of the state constabulary force, you have ever been prosecuted for the sale or keeping for sale of intoxicating liquors. *Second.* Have you ever paid any money to any state constable, and do you know of any corrupt practice or improper conduct of the state police? If so, state fully what sums, and to whom you have thus paid money, and also what you know of such corrupt practice and improper conduct." He answered in writing as follows: " Intending no disrespect to the honorable senate, I answer, under advice of counsel, that I am ready and willing to answer the first question; but I decline to answer the second question,

Opinion of the Court.

upon the grounds, *First*, that the answer thereto will accuse me of an indictable offence; *Second*, that the answer thereto will furnish evidence against me by which I can be convicted of such an offence." The senate thereupon committed him to the custody of the sergeant-at-arms, to be confined in jail for twenty-five days, or until the further order of the senate, unless he should sooner answer the questions. He was imprisoned accordingly, and the case was brought before Judge Wells of the Supreme Judicial Court on a writ of *habeas corpus*, and was fully argued. It was held under advisement and for conference with the other judges; and in the opinion subsequently delivered by Judge Wells it is stated, that that opinion had the approval and unanimous concurrence of all the members of the court. It is said in the opinion, in regard to the second question put to the witness : " It is apparent that an affirmative answer, to the question put to him, might tend to show that he had been guilty of an offence, either against the laws relating to the keeping and sale of intoxicating liquors, or under the statute for punishing one who shall corruptly attempt to influence an executive officer by the gift or offer of a bribe. Gen. Sts. c. 163, § 7."

In regard to the clause above quoted from the bill of rights, the opinion says: " By the narrowest construction, this prohibition extends to all investigations of an inquisitorial nature, instituted for the purpose of discovering crime, or the perpetrators of crime, by putting suspected parties upon their examination in respect thereto, in any manner, although not in the course of any pending prosecution. But it is not even thus limited. The principle applies equally to any compulsory disclosure of his guilt by the offender himself, whether sought directly as the object of the inquiry, or indirectly and incidentally for the purpose of establishing facts involved in an issue between other parties. If the disclosure thus made would be capable of being used against himself as a confession of crime, or an admission of facts tending to prove the commission of an offence by himself, in any prosecution then pending, or that might be brought against him therefor, such disclosure would be an accusation of himself, within the

meaning of the constitutional provision. In the absence of regulation by statute, the protection against such self-accusation is secured by according to the guilty person, when called upon to answer as witness or otherwise, the privilege of then avowing the liability and claiming the exemption; instead of compelling him to answer and then excluding his admissions so obtained, when afterwards offered in evidence against him. This branch of the constitutional exemption corresponds with the common law maxim, *nemo .tenetur seipsum accusare*, the interpretation and application of which has always been in accordance with what has been just stated. Broom Max. 5th ed. 968; Wingate Max. 486; Rosc. Crim. Ev. 2d Am. ed. 159; Stark. Ev. 8th Am. ed. 41, 204, and notes; 1 Greenl. Ev. § 451, and notes." The opinion then cites the case of *People* v. *Kelly* (*supra*) as holding that the clause in the constitution of New York of 1846 protected a witness from being compelled to answer to matters which might tend to criminate himself, when called to testify against another party; and also, *People* v. *Mather*, 4 Wend. 229, as declaring that the exemption in the constitution of New York extended to the disclosure of any fact which might constitute an essential link in a chain of evidence by which guilt might be established, although that fact alone would not indicate any crime. The opinion then proceeds: "The third branch of the provision in the constitution of Massachusetts, 'or furnish evidence against himself,' must be equally extensive in its application; and, in its interpretation, may be presumed to be intended to add something to the significance of that which precedes. Aside from this consideration, and upon the language of the proposition standing by itself, it is a reasonable construction to hold that it protects a person from being compelled to disclose the circumstances of his offence, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him. For all practical purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of

those who could give evidence concerning the transaction, the instrument by which a crime was perpetrated, or even the *corpus delicti* itself. Both the reason upon which the rule is founded, and the terms in which it is expressed, forbid that it should be limited to confessions of guilt, or statements which may be proved in subsequent prosecutions, as admissions of facts sought to be established therein." The court then proceeds to hold that those constitutional provisions applied to investigations before a legislative body.

Passing then to consider the effect of the statute of 1871, the opinion says: "It follows from the considerations already named, that, so far as this statute requires a witness, who may be called, to answer questions and produce papers which may tend to criminate himself, and attempts to take from him the constitutional privilege in respect thereto, it must be entirely ineffectual for that purpose, unless it also relieves him from all liabilities, for protection against which the privilege is secured to him by the constitution. The statute does undertake to secure him against certain of those liabilities, to wit, the use of any disclosures he may make, as admissions or direct evidence against him, in any civil or criminal proceeding." The opinion then refers to the case of *People* v. *Kelly, supra,* and says that that decision was made upon the ground that the terms of the provision of the constitution of New York protected the witness only from being compelled "to be a witness against himself," and did not protect him from the indirect and incidental consequences of a disclosure which he might be called upon to make.

The opinion then says: "The terms of the provision in the constitution of Massachusetts require a much broader interpretation, as has already been indicated; and no one can be required to forego an appeal to its protection, unless first secured from future liability, and exposure to be prejudiced, in any criminal proceeding against him, as fully and extensively as he would be secured by availing himself of the privilege accorded by the constitution. Under the interpretation already given, this cannot be accomplished so long as he remains liable to prosecution criminally for any matters or

causes in respect of which he shall be examined, or to which his testimony shall relate. It is not done, in direct terms, by the statute in question; it is not contended that the statute is capable of an interpretation which will give it that effect; and it is clear that it cannot and was not intended to so operate. Failing, then, to furnish to the persons to be examined an exemption equivalent to that contained in the constitution, or to remove the whole liability against which its provisions were intended to protect them, it fails to deprive them of the right to appeal to the privilege therein. The result is, that, in appealing to his privilege, as an exemption from the obligation to answer the inquiries put to him, the petitioner was in the exercise of his constitutional right; and his refusal to answer upon that ground was not, and could not be considered as, disorderly conduct, or a contempt of the authority of the body before which he was called to answer. There being no legal ground to authorize the commitment upon which he is held, he must be discharged therefrom."

In *Cullen* v. *Commonwealth*, 24 Gratt. 624, in 1873, Cullen, when asked before a grand jury to state what he knew of a certain duel, declined to answer, because the answer would tend to criminate him. The Hustings Court ordered him to answer, and, on his still refusing to do so, fined him and committed him to jail. The case was brought before the Court of Appeals of Virginia. The bill of rights of the constitution of Virginia of 1870, in § 10 of article 1, provided that no man can "be compelled to give evidence against himself." That provision had existed in the bill of rights of Virginia as far back as June 12, 1776, and of it the Court of Appeals said that it was the purpose of its framers "to declare, as part of the organic law, that no man should anywhere, before any tribunal, in any proceeding, be compelled to give evidence tending to criminate himself, either in that or any other proceeding;" and that the provision could not be confined "only to cases in which a man is called on to give evidence himself in a prosecution pending against him."

The opinion then cited *People* v. *Kelly*, and *Emery's Case* hereinbefore referred to, as sustaining its view, and proceeded

to consider the effect of an act of Virginia, passed October 31, 1870, in regard to duelling, which provided as follows: "Every person who may have been the bearer of such challenge or acceptance, or otherwise engaged or concerned in any duel, may be required, in any prosecution against any person but himself, for having fought, or aided or abetted in such duel, to testify as a witness in such prosecution; but any statement made by such person, as such witness, shall not be used against him in any prosecution against himself." The court held that the effect of the statute was to invade the constitutional right of the citizen, and to deprive the witness of his constitutional right to refuse to give evidence tending to criminate himself, without indemnity, and that the act was, therefore, to that extent, unconstitutional and void. It held further that, before the constitutional privilege could be taken away by the legislature, there must be absolute indemnity provided; that nothing short of complete amnesty to the witness, an absolute wiping out of the offence as to him, so that he could no longer be prosecuted for it, would furnish that indemnity; that the statute in question did not furnish it, but only provided that the statement made by the witness should not be used against him in a prosecution against himself; that, without using one word of that statement, the attorney for the commonwealth might in many cases, and in a case like that in hand, inevitably would, be led by the testimony of the witness to means and sources of information which might result in criminating the witness himself; and that this would be to deprive the witness of his privilege, without indemnity. The judgment of the Hustings Court was reversed.

In *State* v. *Nowell*, 58 N. H. 314, in 1878, article 15 of the bill of rights in the constitution of New Hampshire of 1792, declared, that no subject shall "be compelled to accuse or furnish evidence against himself." Nowell refused to testify before a grand jury as to whether, as a clerk for one Goodwin, he had sold spirituous liquors, and whether Goodwin sold them or kept them for sale. He declined to answer on the ground that his evidence might tend to criminate himself. A statute of the State (Gen. Stat. c. 99, § 20) provided as follows: "No

clerk, servant or agent of any person accused of a violation of this chapter, shall be excused from testifying against his principal, for the reason that he may thereby criminate himself; but no testimony so given by him shall, in any prosecution, be used as evidence, either directly or indirectly, against him, nor shall he be thereafter prosecuted for any offence so disclosed by him." A motion having been made, before the Supreme Court of New Hampshire, for an attachment against him for contempt for refusing to testify, that court, after quoting the provision in the bill of rights, said: "The common law maxim (thus affirmed by the bill of rights) that no one shall be compelled to testify to his own criminality, has been understood to mean, not only that the subject shall not be compelled to disclose his guilt upon a trial of a criminal proceeding against himself, but also that he shall not be required to disclose, on the trial of issues between others, facts that can be used against him as admissions tending to prove his guilt of any crime or offence of which he may then or afterwards be charged, or the sources from which, or the means by which, evidence of its commission or of his connection with it may be obtained. *Emery's Case,* 107 Mass. 172, 181."

In regard to the statute, the court said that the legislature, having undertaken to obtain the testimony of the witness without depriving him of his constitutional privilege of protection, must relieve him from all liabilities on account of the matters which he is compelled to disclose; that he was to be secured against all liability to future prosecution as effectually as if he were wholly innocent; that this would not be accomplished if he were left liable to prosecution criminally for any matter in respect to which he might be required to testify; that the statute of New Hampshire went further than the statute of Massachusetts considered in *Emery's Case,* because it provided that the witness should not be thereafter prosecuted for any offence so disclosed by him; that the witness had, under the statute, all the protection which the common law right, adopted by the bill of rights in its common law sense, gave him; that, if he should be prosecuted, a plea that he had disclosed the same offence on a lawful accusation against his

principal would be a perfect answer in bar or abatement of the prosecution against himself; and that, unless he should testify, the motion for the attachment must be granted.

In 1880, in *La Fountaine* v. *Southern Underwriters*, 83 N. Car. 132, the constitution of North Carolina of 1876 had provided, in the declaration of rights, (Article 1, sec. 11,) that, " in all criminal prosecutions, every man has the right . . . to . . . not be compelled to give evidence against himself." One Blacknall, as a witness in a hearing before a referee in a civil suit, had refused to answer a question as to his possession of certain books, on the ground that indictments were pending against him, connected with the management of the affairs of the association owning the books, and that his answer to the question might tend to criminate him. The case was heard before an inferior state court, which ruled that he must answer the question. On appeal to the Supreme Court of North Carolina, it held that the fair interpretation of the constitutional provision was to secure a person, who was, or might be, accused of crime, from making any compulsory revelations which might be used in evidence against him on his trial for the offence ; that, as the witness was protected from the consequences of the discovery, and the facts elicited could be given in evidence in no criminal prosecution to which they were pertinent, the plaintiff in the case was entitled to all the information which the witness possessed, whether it did or did not implicate the witness in a fraudulent transaction; that the inquiry could not be evaded upon any ground of the self-criminating answer which might follow, although the answers of the witness could not be used against him in any criminal proceeding whatever; and that his constitutional right not to " be compelled to give evidence against himself" would be maintained intact and full.

In *Temple* v. *Commonwealth*, 75 Virginia, 892, in 1881, the same § 10 of article 1 of the bill of rights of the constitution of Virginia of 1870, that was considered in *Cullen* v. *Commonwealth*, *supra*, was in force. An indictment had been found by a grand jury, on the evidence of Temple, against one Berry, for setting up a lottery. On the trial of Berry before the

petit jury, Temple refused to testify, on the ground that by so doing he would criminate himself; and for such refusal he was fined and imprisoned for contempt by the Hustings Court. The case was taken to the Court of Appeals by writ of error. That court cited with approval *Cullen's Case, supra,* and held that it was applicable. It appeared that in the Hustings Court, the attorney for the Commonwealth was asked whether any prosecution was pending against Temple in that court, or whether it was the intention of such attorney to institute a proceeding against Temple for being concerned in a lottery, to both of which questions he replied in the negative.

The Court of Appeals held that Temple had a right to stand upon his constitutional privilege, and not to trust to the chances of a further prosecution ; that the court could offer him no indemnity that he would not be further prosecuted, nor could the attorney for the Commonwealth ; that Temple had a right to remain silent whenever any question was asked him, the answer to which might tend to criminate himself; that the great weight of authority in the United States was in favor of the rule that, when a witness on oath declared his belief that his answer would tend to criminate himself, the court could not compel him to answer, unless it was perfectly clear, from a careful consideration of all the circumstances in the case, that the witness was mistaken, and that the answer could not possibly have such a tendency ; and that the Hustings Court had no right to compel Temple to answer the question propounded to him, and to fine and imprison him for his refusal to answer it. The court further held, that the statute of the State which provided that no witness giving evidence in a prosecution for unlawful gaming should ever be proceeded against for any offence of unlawful gaming committed by him at the time and place indicated in such prosecution, did not apply to the case then in hand, because setting up a lottery was not within the statute against unlawful gaming. The judgment of the Hustings Court was reversed.

In *Boyd* v. *United States,* 116 U. S. 616, in 1886, this court, in considering the Fifth Amendment to the Constitution of

the United States, which declares that no person "shall be compelled in any criminal case to be a witness against himself," and the Fourth Amendment, which declares that the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, said, speaking by Mr. Justice Bradley (p. 631): "And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." It was further said (p. 633): "We have already noticed the intimate relation between the two amendments. They throw great light on each other. For the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself. We think it is within the clear intent and meaning of those terms. . . . As, therefore, suits for penalties and forfeitures incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; and we are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him

to be a witness against himself, within the meaning of the
Fifth Amendment to the Constitution, and is the equivalent of
a search and seizure — and an unreasonable search and seizure
— within the meaning 'of the Fourth Amendment. Though
the proceeding in question is divested of many of the aggra-
vating incidents of actual search and seizure, yet, as before
said, it contains their substance and essence, and effects their
substantial purpose. It may be that it is the obnoxious thing
in its mildest and least repulsive form; but illegitimate and
unconstitutional practices get their first footing in that way,
namely, by silent approaches and slight deviations from legal
modes of procedure. This can only be obviated by adhering
to the rule that constitutional provisions for the security of
person and property should be liberally construed. A close
and literal construction deprives them of half their efficacy,
and leads to gradual depreciation of the right, as if it consisted
more in sound than in substance. It is the duty of courts to
be watchful for the constitutional rights of the citizen, and
against any stealthy encroachments thereon. Their motto
should be *obsta principiis.*"

In that case, the fifth section of the act of June 22, 1874,
18 Stat. 187, which authorized the court in revenue cases to
require the defendant or claimant to produce his private
papers in court, or else the allegations of the government's
attorney would be taken as confessed, was held to be uncon-
stitutional and void, as applied to a suit for a penalty or to
establish a forfeiture of the goods of the party, because it was
repugnant to the Fourth and Fifth Amendments to the Con-
stitution; and it was held that a proceeding to forfeit the
goods was a criminal case within the meaning of the Fifth
Amendment. Mr. Justice Miller, in the concurring opinion of
himself and Chief Justice Waite in the case, agreed that it was
a criminal one, within the meaning of the Fifth Amendment,
and that the effect of the act of Congress was to compel the
party on whom the order of the court was served, to be a wit-
ness against himself.

In *People* v. *Sharp*, 107 N. Y. 427, in 1887, the Court of
Appeals of New York had under consideration the provision

of article 1, § 6, of the constitution of New York of 1846, that no person shall "be compelled, in any criminal case, to be a witness against himself," and the provision of § 79 of the Penal Code of New York, title 8, chapter 1, in regard to bribery and corruption, which was in these words : ."A person offending against any provision of any foregoing section of this code relating to bribery, is a competent witness against another person so offending, and may be compelled to attend and testify upon any trial, hearing, proceeding or investigation, in the same manner as any other person. But the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying. A person so testifying to the giving of a bribe which has been accepted, shall not thereafter be liable to indictment, prosecution, or punishment for that bribery, and may plead or prove the giving of testimony accordingly, in bar of such an indictment or prosecution." Sharp and others were indicted for bribing a member of the common council, and Sharp was tried separately. It was proved that he had been examined as a witness before a committee of the state senate, and there gave testimony which the prosecution claimed was evidence of his complicity in the crime; and that testimony was offered in evidence by the prosecution. The testimony had been given under the compulsion of a subpœna, and was admitted at the trial, against the objection that the disclosures before the senate committee were privileged. The Court of Appeals held that § 79 of the Penal Code made the constitutional privilege inapplicable, because it indemnified or protected the party against the consequences of his previous testimony. The court cited with approval the case of *People* v. *Kelly, supra.*

In *Bedgood* v. *The State*, 115 Indiana, 275, in 1888, the Supreme Court of Indiana had under consideration the provision of article 1, § 14 of the bill of rights of the constitution of Indiana of 1851, which provides that "no person in any criminal prosecution shall be compelled to testify against himself," and the provision of § 1800 of the Revised Statutes of Indiana of 1881, to the effect that testimony given by a witness should not be used in any prosecution against him. On

a trial before a petit jury in a criminal case against others, a woman had refused to answer a question, on the ground that the answer might criminate her. The Supreme Court held that, as the statute prohibited her testimony from being used against her, it completely protected her, and the judgment was reversed because the trial court had erroneously refused to require her to answer the question.

This review of the cases above referred to shows that in the constitutions of Georgia, California and New York the provision is identically or substantially that of the Constitution of the United States, namely, that no person shall "be compelled in any criminal case to be a witness against himself;" while in the constitutions of Pennsylvania, Arkansas, Indiana, Massachusetts, Virginia, New Hampshire and North Carolina it is different in language, and to the effect that "no man can be compelled to give evidence against himself;" or that, in prosecutions, the accused "shall not be compelled to give evidence against himself;" or that "no person in any criminal prosecution shall be compelled to testify against himself;" or that no person shall be "compelled to accuse or furnish evidence against himself;" or that no man can "be compelled to give evidence against himself;" or that, in all criminal prosecutions, "every man has the right to not be compelled to give evidence against himself."

Under the constitutions of Arkansas, Georgia, California, Indiana, New York, New Hampshire and North Carolina it was held that a given statutory provision made it lawful to compel a witness to testify; while in Massachusetts and Virginia it was held that the statutory provisions were inadequate, in view of the constitutional provision. In New Hampshire, and in New York under the Penal Code, it was held that the statutory provisions were sufficient to supply the place of the constitutional provision, because, by statute, the witness was entirely relieved from prosecution.

But, as the manifest purpose of the constitutional provisions, both of the States and of the United States, is to prohibit the compelling of testimony of a self-criminating kind from a party or a witness, the liberal construction which must be placed

upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation; and that where the constitution, as in the cases of Massachusetts and New Hampshire, declares that the subject shall not be "compelled to accuse or furnish evidence against himself," such a provision should not have a different interpretation from that which belongs to constitutions like those of the United States and of New York, which declare that no person shall be "compelled in any criminal case to be a witness against himself." Under the rulings above referred to, by Chief Justice Marshall and by this court, and those in Massachusetts, New Hampshire, and Virginia, the judgment of the Circuit Court in the present case cannot be sustained. It is a reasonable construction, we think, of the constitutional provision, that the witness is protected "from being compelled to disclose the circumstances of his offence, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his connection, without using his answers as direct admissions against him." *Emery's Case*, 107 Mass. 172, 182.

It is quite clear that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply one, at least unless it is so broad as to have the same extent in scope and effect. It is to be noted of § 860 of the Revised Statutes that it does not undertake to compel self-criminating evidence from a party or a witness. In several of the state statutes above referred to, the testimony of the party or witness is made compulsory, and in some either all possibility of a future prosecution of the party or witness is distinctly taken away, or he can plead in bar or abatement the fact that he was compelled to testify.

We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not

supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates. In this respect, we give our assent rather to the doctrine of *Emery's Case*, in Massachusetts, than to that of *People* v. *Kelly*, in New York; and we consider that the ruling of this court in *Boyd* v. *United States*, *supra*, supports the view we take. Section 860, moreover, affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party.

It is contended on the part of the appellee that the reason why the courts in Virginia, Massachusetts and New Hampshire have held that the exonerating statute must be so broad as to give the witness complete amnesty, is that the constitutions of those States give to the witness a broader privilege and exemption than is granted by the Constitution of the United States, in that their language is that the witness shall not be compelled to accuse himself, or furnish evidence against himself, or give evidence against himself; and it is contended that the terms of the Constitution of the United States, and of the constitutions of Georgia, California and New York are more restricted. But we are of opinion that, however this difference may have been commented on in some of the decisions, there is really, in spirit and principle, no distinction arising out of such difference of language.

From a consideration of the language of the constitutional provision, and of all the authorities referred to, we are clearly of opinion that the appellant was entitled to refuse, as he did, to answer. The judgment of the Circuit Court must, therefore, be

*Reversed, and the case remanded to that court, with a direction to discharge the appellant from custody, on the writ of habeas corpus.*