[Crim. No. 2061.   In Bank.—August 28, 1917.]

THE PEOPLE, Respondent, v. LOREN A. FRYER, Appellant.

CRIMINAL LAW—IMMUNITY FROM PROSECUTION—FAILURE TO READ SEC-
TION 1324, PENAL CODE, TO WITNESS.—Under section 1324 of the
Penal Code, providing for immunity to a witness whose testimony
may incriminate him, a defendant is immune from a prosecution for
murder where he was called as a witness on the preliminary examina-
tion of another person for the same crime, and gave incriminating
testimony against himself without first being instructed as to his
constitutional rights or having read to him the provisions of said
code section.

APPEAL from a judgment of the Superior Court of Trin-
ity County, and from an order denying a new trial. James
W. Bartlett, Judge.

The facts are stated in the opinion of the court.

J. W. Threshie, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy
Attorney-General, and Orr M. Chenoweth, for Respondent.

THE COURT.—Due to a division of opinion of the justices
of the third appellate district, this appeal was transferred to
this court for decision. With the records of the case came
the following opinion of Chipman, Presiding Justice, which is
adopted as the opinion of this court, and for the reasons
therein given the judgment and order appealed from are
reversed:

Defendant was convicted of the murder in the first degree
of one Lem Sing and was sentenced to life imprisonment.
He appeals from the judgment and from the order denying
his motion for a new trial.

The deceased was a Chinaman engaged in placer mining
near the town of Weaverville, Trinity County. The evidence
showed that deceased was wantonly murdered by defendant
for the purposes of robbery. It is not contended that the evi-
dence was insufficient to justify the verdict.

CLXXV Cal.—50

It appears that one Ray Glenn was complained against for the murder of this same person, Lem Sing, and that at his preliminary examination this defendant was called as a witness, sworn, and examined, and he then and there testified to facts, in response to questions propounded by the district attorney, which incriminated himself; that previous to his testifying he was not instructed as to his constitutional rights in any manner, nor was section 1324 of the Penal Code read to him by any person.

The trial of the cause was set for March 20, 1916, and on that day, before the examination and impanelment of the jury, defendant's counsel moved to dismiss the information on the grounds that at the preliminary examination of said Ray Glenn, this defendant was called as a witness and was compelled to and did give incriminating evidence against himself, and that the provisions of section 1324 of the Penal Code were not complied with, the same being a renewal of the motion previously made on February 14, 1916, at the arraignment of defendant. After the verdict, defendant moved in arrest of judgment on the ground that the court had no jurisdiction of the offense charged; also moved for a new trial on all the grounds above stated. The motions were denied.

At the hearing of defendant's motion made at the commencement of the trial, defendant testified that he was sixteen years old; that before being called as a witness at the preliminary examination of Ray Glenn, he had several conversations with the district attorney and also just before he was called to testify. "Q. Did he, at any of these conversations, or at that conversation, state to you anything in regard to your rights as a witness in this matter? A. No, sir. Q. Did he give you any instructions or advice in reference to your testifying in that case? A. Well, he gave me a little advice —what I would call advice. Mr. Threshie: Q. Previous to your testifying and at the last consultation you had with the district attorney, what did you say in reference to that, if anything? A. I told him I wouldn't appear against Ray. Q. What did he say? A. He told me I didn't know what that meant. Q. What 'appear' meant? A. Yes, sir. Q. What did you say? A. I told him I did. Q. Did he at that time instruct you in any manner as to your rights under the law, as a witness? A. No, sir. Q. At the preliminary hear-

ing of Ray Glenn, who called you as a witness—who came
after you? A. Mr. Bigelow [the sheriff]. Q. What did he
do? A. He came down there and unlocked the door and
brought me up. Q. Did he say to you what you were wanted
for? A. No, sir. . . . Q. When you were in the courtroom,
I will ask you whether or not you were called as a witness
and placed upon the witness-stand? A. I was. Q. At that
time did you receive any instructions from the district at-
torney, the magistrate holding the hearing, or anybody in
regard to your rights? A. No, sir. Q. Did you or did you
not then testify in the case? A. I did.''

The evidence taken at the Glenn preliminary was intro-
duced. The testimony there given by defendant Fryer was
that he personally killed the deceased in pursuance of a
scheme concocted by him and Glenn to rob the mine of de-
ceased and other mines. After the people had rested, Sheriff
Bigelow was recalled by Glenn's attorney. He had previ-
ously testified that Fryer had made a statement to him that
Glenn had proposed to Fryer to rob certain mines, including
deceased's mine. On his recall, Bigelow testified that ''he
had conversation with him [Fryer] a good many times'';
that he had a conversation with him shortly before Glenn's
preliminary examination: ''Q. What was that conversation?
A. Well, I was out working on the books; and I let him out
for exercise and he rapped on the window and called me to
the door and said he had decided to tell the truth, and I said,
'All right,' and he said, 'Mr. Glenn was not over when this
robbery or murder,' I forget which way he worded it, 'was
committed; I did it myself.' Q. Did he say anything in con-
nection at that as to whether or not Mr. Glenn was connected
with it in any way? A. He said he went over to the mine in
the morning and the Chinaman ordered him out of the mine
and I asked him why the Chinaman ordered him out of the
mine, and he said he didn't know. I was sitting down and
he said, 'He made a rush at me and hit me with the flat
part of the shovel, and my head has been sore ever since,'
and he knocked him out for a while and when he came to, he
said: 'I will just come back and get you, you Chinese son-of-
a-bitch.' '' Witness further testified: ''The boy told me in
the morning, and then again he told me different. He con-
tradicted his story again in the afternoon.'' Later, as we
have seen, Fryer testified at the Glenn preliminary implicat-

ing Glenn.   Among other stories told by him was one—that
a number of Chinamen "had hired him to kill Lim Sing."
This was substantially all the evidence taken at the Glenn
preliminary.   There was then introduced in support of the
motion the evidence taken at Fryer's preliminary examina-
tion, Mr. Threshie appearing for defendant.   Defendant did
not testify at his preliminary hearing.   The testimony con-
sisted in part of statements made by defendant to the district
attorney, the sheriff, and his deputy in which he narrated
with particularity his movements on the day of the murder
and when and how and why he killed the deceased.

It appeared that defendant was taken into custody about
9 o'clock on the morning of November 12th, three days after
the killing.   Some facts had previously been elicited pointing
toward defendant as having some knowledge of or connection
with the crime.   On this morning, after having made some
statement to the district attorney and sheriff concerning his
movements on November 9th, stating, among other things,
that he had been out hunting on that morning and was in
the neighborhood of the Lim Sing mine, he consented to go
with the officers and show them the route he traveled.   This
he did, and it corresponded to a particular point where he
crossed a gulch, with the tracks which the officers had fol-
lowed by back-tracking from the point near where the body
of Lim Sing was found.   At this point of divergence there
were no tracks found leading in the direction which defend-
ant said he had taken, but the trail from that point led to
the place from which he shot deceased.   There was evidence
that the tracks made in the snow corresponded with the tracks
made by the shoes defendant was wearing, as was shown by
applying them to the tracks with defendant's consent.   The
district attorney learned before the information was filed
that defendant was seen by a school girl on November 9th
going toward the Lim Sing mine with a gun.

The complaint in the justice's court against Fryer was filed
on November 20, 1915, and his preliminary examination did
not take place until January 18, 1916.   The complaint
against Glenn was filed November 22d, and his preliminary
examination was held on December 6, 1915.   The information
against Fryer was filed February 7, 1916.

From the foregoing it will appear that defendant, while in
jail upon the charge of murder and in the custody of the

sheriff, was taken before the magistrate without counsel to testify in a case wherein Ray Glenn was charged by a complaint duly filed with having murdered this same Lim Sing. There was then on file in the justice's court a complaint against Fryer for the same crime. But the information against Fryer was not filed until the following February. It does not appear when an information was filed against Glenn.

The principal, indeed, the only, witness whose testimony in any way implicated Glenn was the defendant Fryer. There can be no doubt but that Glenn was held to answer upon the testimony of Fryer. And the question is fairly presented whether, under the provisions of section 1324 of the Penal Code, the motion should have been granted. That the exact situation of Fryer at the time he was called to testify may be known, we quote from the record of the Glenn preliminary examination:

"Court: Are you ready to proceed, Gentlemen?

"Mr. Reid: Yes, sir. We ask that Mr. Woodbury be appointed as reporter in this case.

"Mr. Given: No objection at all, your Honor.

"(Mr. Woodbury was sworn.)

"Mr. Reid: The court will inform the defendant [Glenn] as to his rights as to counsel and so forth.

"Mr. Given: That has already been done. There is no use taking up time doing it any further. I represent the defendant.

"Mr. Reid: Call Loren Fryer.

"Court: You do solemnly swear the testimony you will give in the case now pending before this court, wherein the people of the state of California is plaintiff and Ray Glenn is defendant, shall be the truth, the whole truth and nothing but the truth, so help you God?

"Loren Allen Fryer: Yes, sir.

"Mr. Reid: What is your name? A. Loren Allen Fryer.

"Q. How old are you? A. I will be sixteen on the 21st of December."

The witness, in response to questions, then narrated the story of his crime in response to questions put by the district attorney, and Glenn's connection with it. We have in an earlier part of this opinion quoted from the testimony of defendant given at the hearing of the motion which is undisputed. He there states that he had a conversation with the

district attorney the morning of the preliminary hearing of Glenn or the evening before, and that neither then nor when he was called before the magistrate was he given any advice or instructions as to his rights as a witness or with reference to his testifying. As having some possible bearing upon the question, it may be stated further that on November 13, 1915, Fryer made a statement in the district attorney's office in the presence of the district attorney, W. R. Bigelow (sheriff), Harvey Bigelow, Loren Allen Fryer, and Frank I. Woodbury (stenographer). This statement was introduced at the Fryer preliminary but was objected to by defendant's counsel on the ground that no proper foundation was laid for it. In this statement or confession, Fryer narrated the circumstances of the killing; claimed that he was hired to do it by some Chinaman, but did not in any way implicate Glenn.

We made an effort to ascertain the scope of section 1324 of the Penal Code, in *People* v. *Knowles,* 27 Cal. App. 498, [155 Pac. 137]. In that case, Knowles was one of a number of persons being investigated on the charge of offering a bribe to an officer which was alleged to have been received by that officer in connection with the granting of a certain liquor license. He was called before the grand jury and sworn and examined. Before testifying, he was told by the district attorney the purpose of the investigation and that he, Knowles, was one of the parties being investigated. He was cautioned in certain particulars, but, as we held, not in conformity with the provisions of section 1324, and this section was not read to him. After being thus cautioned he was asked if he cared to make any statement to the grand jury in reference to the matter and answered: "I do." It was conceded that Knowles' testimony did, in fact, incriminate himself as well as the others charged in the indictment and was the testimony on which, in part, the indictment was found.

The construction given the section in the Knowles' case seemed to us the correct one, and the writer of this opinion still adheres to it, although, if adopted as the law in the present case, it will lead to the freedom of a confessed murderer. The responsibility for such a regrettable result lies not necessarily with the statute, but in the failure to follow its mandates in conducting the proceedings against these two men. The purpose of the act is to compel a confederate in the commission of crime to testify against his co-confederates,

which could not be done under the law as it stood prior to the enactment of this section. But to make this possible without violating the Constitution, the act extended complete immunity to the witness as a reward for his service to the state. In putting the section into practice it rests with the district attorney to decide which one of the confederates, if either, is to be made a witness, and having so decided and so acted, wisely or unwisely, he cannot deprive this witness of the fruits of such decision.

Beyond question, the testimony given by defendant was against another person who, with the defendant, was charged with the same offense and was given in a "trial, proceeding or lawful investigation or judicial proceeding." We are also satisfied that the testimony was not given "voluntarily." It is true that defendant failed "to ask to be excused from testifying," and neither did he "demand that he be excused from testifying." Notwithstanding this fact, however, the section provides that "any person shall be deemed to have asked to be excused from testifying . . . unless before any testimony is given . . . the judge, foreman or other person presiding at such trial, hearing, proceeding or investigation, shall distinctly read this section of this code to such a witness." If this provision is to be given any force, it must mean that whether or not the witness "demands that he be excused," or "asks to be excused from testifying," the statute has made the demand or request for him in providing that he "shall be deemed to have asked to be excused from testifying . . . unless before any testimony is given . . . by such witness, the judge . . . shall distinctly read this section of this code to such witness."

The section provides that the witness shall not be exempt from "indictment, presentment by information, prosecution or punishment for the offense with reference to which he may have testified as aforesaid, . . . where such person so testifying . . . does so voluntarily." The section also provides that he shall not be exempt "when such person so testifying or so producing evidence fails to ask to be excused from testifying or so producing evidence." But if, as the statute says, such person "is deemed to have asked to be excused from testifying" unless the section is read to him before testifying, his silence or failure to ask to be excused cannot be taken as bringing him within the class of persons who

testify "voluntarily." The section is a long one and is set out fully in the Knowles' case. In that case there was some attempt made to inform the witness of his rights. In the present case the witness, a mere boy, was taken from his cell in the jail and called to the witness-stand, was sworn and testified without a word of instruction as to his rights, and the section was not read to him. We are unable to distinguish this case from the Knowles' case, and must hold, as there, that defendant earned his right to immunity, and his motion should have been granted.

The attorney-general urges the application of section 4½, article VI, of the Constitution, claiming that as defendant's testimony at the Glenn preliminary was not used at defendant's trial, "there is nothing upon which to presume prejudicial error," and that "under the present practice, the duty is cast upon defendant of clearly showing injury to the extent of resulting in a miscarriage of justice." The argument proceeds upon the assumption that defendant was undoubtedly shown to be guilty, and, hence, there could not possibly have been a miscarriage of justice in bringing him to trial. But section 1324 is based on the assumption of the guilt of the person compelled to testify, and its purpose is to bring others to the bar of justice by granting immunity to one of the confederates. The promise made to him is that he shall not be put to trial at all. As was said in *State* v. *Nowell,* 58 N. H. 314: "His legal immunity from prosecution was equivalent to his legal innocence of the crime disclosed by his testimony." To hold that section 4½ applies would render the statute inoperative, for no one could be expected to incriminate himself if he knew he was liable to be tried for the crime he confesses and that the statutory promise was but a scrap of paper of no binding force upon the state.

The attorney-general attacks the section as in violation of several articles and sections of the Constitution, and among other grounds that the title to the act is fatally deficient. We are not inclined to enter upon an extended discussion of this point. The general objection to this kind of legislation as unconstitutional has been before the court quite frequently and has, as we believe, been sustained by the weight of authority. We content ourselves with the following citations: *Ex parte Clarke,* 103 Cal. 352, [37 Pac. 230] ; *Ex parte Cohen,* 104 Cal. 524, [43 Am. St. Rep. 127, 26 L. R. A. 423, 38 Pac.

364]; *Counselman* v. *Hitchcock,* 142 U. S. 547, [35 L. Ed. 1110, 12 Sup. Ct. Rep. 195]; *In re Buskett,* 106 Mo. 602, [27 Am. St. Rep. 378, 14 L. R. A. 407, and note 17 S. W. 753]; *State* v. *Nowell,* 58 N. H. 314. The title of the act is as follows: "An act to add a new section to the Penal Code, to be numbered section 1324, relating to testimony of witnesses refusing to answer on the grounds that such answers will incriminate himself." It is said that the title does not contain a word about the granting of immunity to a witness nor anything about when the state will refuse to "prosecute a person charged with crime," and fails to support the second and third subdivisions of the section. Without going into the matter in detail, it seems to us that the question of immunity to a witness whose testimony may incriminate himself would naturally arise and become a part of an act dealing with the subject mentioned in the title, and so also the other provisions found in the act which seem to us to be germane to the title. "It was never expected that the title to an act should be an index to all of its provisions, and so long as the provisions themselves are cognate, attingent, and germane to the subject matter of the title, no violence is done to the Constitution" (Mr. Justice Henshaw, in *Ex parte Hallawell,* 155 Cal. 112, [99 Pac. 490]); and the court deemed it proper to say "that the constitutional provision involved was not designed as a loophole of escape from, or a means for the destruction of, legitimate legislation." (See *Ex parte Liddell,* 92 Cal. 633, [29 Pac. 251]; note to Treadwell's Annotated Constitution, p. 243, under art. IV, sec. 24, of the Constitution.)

We do not think the court would be warranted in forcing a construction of the statute which would justify the ruling of the court in order to prevent what otherwise would lead to a miscarriage of justice, for the cases all hold that this class of legislation is to be liberally construed.

The judgment and order are reversed.

ANGELLOTTI, C. J., Dissenting.—I dissent. I agree with Mr. Justice Hart, of the district court of appeal, as to the construction that should be given to section 1324 of the Penal Code, and concur generally in the opinion written by him and concurred in by Mr. Justice Burnett. That opinion is as follows:

"I am not prepared to agree with the conclusion of the presiding justice as to the construction of section 1324 of the Penal Code. It is readily to be conceded that the language of that section as a whole is singularly ambiguous and the real intent of the statute correspondingly obscure. Indeed, the several provisions of the section appear to be inconsistent with themselves; and for this very reason the language of the section should not be too literally followed, but given a construction which, it seems to me, will discover what may well be said to be the true intent of the statute—a consideration not wholly without support from the language of the section and under which its primary and important purpose may as well be effectuated as by the construction given it by my associate and at the same time afford less reason for apprehending from its practical application serious consequences to the public and society.

"So much of the section as is necessary for my purposes here reads as follows: 'No person shall be exempt from indictment, presentment by information, prosecution or punishment for the offense with reference to which he may have testified as aforesaid, or for or on account of any transaction, matter or thing concerning which he may have testified as aforesaid, or produced evidence, documentary or otherwise, where such person so testifying or so producing evidence, documentary or otherwise, does so voluntarily, or when such person so testifying or so producing evidence fails to ask to be excused from testifying or so producing evidence, on the ground that his testimony or such evidence. documentary or otherwise, may incriminate himself, but in all such cases, the testimony or evidence, documentary or otherwise, so given may be used in any criminal prosecution or proceeding against the person so testifying or producing such evidence, documentary or otherwise.

" 'Any person shall be deemed to have asked to be excused from testifying or producing evidence, documentary or otherwise, under this section, unless before any testimony is given or evidence, documentary or otherwise, is produced by such a witness, the judge, foreman or other person presiding at such trial, hearing, proceeding or investigation, shall distinctly read this section of this code to such witness, and the form of the objection by the witness shall be immaterial, if he in substance makes objection that his testimony or the

production of such evidence, documentary or otherwise, may incriminate himself, and he shall not be obliged to object to each question, but one objection shall be sufficient to protect such witness from prosecution for any offense concerning which he may testify, or for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise, upon such trial, hearing, proceeding or investigation.'

"A careful examination of the section will, I think, show that there are three propositions contained therein which cannot be disputed, to wit: 1. That immunity will not be granted to one who voluntarily gives testimony which incriminates or tends to incriminate himself; 2. That such immunity will not be granted unless the witness asks to be excused; 3. That where he desires to be excused, he must make an objection in some form to the giving of the testimony.

"Very clearly, if a witness voluntarily testifies, the provision of the statute that he may gain immunity by asking to be excused has no application. Voluntarily testifying and testifying only after asking to be excused are obviously two entirely different propositions. If a witness testifies only after he has asked or demanded to be excused, he is not a voluntary witness; for he may not even then be excused from testifying. On the contrary, he is compelled to testify whether he wants to or not, but, having asked to be excused, he may not be prosecuted for the offense or charge to which his testimony so given relates. But the question arises: How and by whom is it to be made known that he does not appear as a voluntary witness? I think that the reply to this question is to be found in the latter part of the section, where language is used plainly implying that the witness must himself make it known, in some manner or form, *in the proceeding in which he is called as a witness* that he objects to testifying in said proceeding, because his testimony so given will incriminate him. Not only does this appear to be true, but the same language of the section to my mind implies that, unlike the case where extrajudicial incriminatory statements are sought to be shown against one accused on trial, the *onus* or burden is upon the witness to show that he made timely objection to giving the testimony, otherwise his testimony will be treated as having been voluntarily given. This must be the correct view because it is not a case where his guilt

is being proved, he having already admitted that he committed the crime, but a case where he is asking the favor of the law—in other words, asking immunity from prosecution, and, therefore, from the consequences of his criminal act.

"But much stress is laid upon the provision of the section that where the entire section is not read to the witness, he shall be deemed to have asked to be excused; and it is said that if that provision of said section is to be given any force, it must mean that whether or not the witness 'demands that he be excused' or 'asks to be excused from testifying,' the statute has made the demand or request for him. True, the statute makes the demand or request to be excused for him, where the section is not read to the witness as prescribed; but, under my view of the section, as above indicated, the statute can make no such 'demand' or 'request,' nor, indeed, is there any occasion for the interposition of the statute in that regard until the witness has himself objected in some manner to the giving of testimony and so disclosed that he is not a voluntary witness.

"The statute does not require nor contemplate that the witness shall specifically request to be excused. He may merely object in a general way to testifying, claiming that his testimony will incriminate him, or make any objection that will disclose that he is not on the stand as a voluntary witness. When he has made such objection, in whatever form, then, if the statute is not read to him, he will be deemed to have asked to be excused, although he may not in specific language have asked or requested or demanded to be excused.

"In conclusion, and by way of recapitulation, my view of the section is this: That no witness who, without objection in any manner or form whatsoever, takes the stand and gives testimony whereby he incriminates himself can claim immunity under the statute; that, if he would claim immunity from prosecution, he must first object or in some manner show that he is not a voluntary witness, and that until he does this, the provision presuming him to have asked to be excused does not apply.

"It does not appear from the proceedings of the preliminary examination of his alleged confederate relating to his testimony that he objected to giving testimony therein, and, under the provision of said section implying that it was his duty to so object if he would be entitled to the immunity guar-

anteed by said section, this court may presume that he made no objection, and was therefore a voluntary witness.''

I therefore think that the judgment and the order appealed from ought to be affirmed.

Lawlor, J., and Lorigan, J., concurred.

Rehearing denied.