THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ALFRED GIALLARENZI, Defendant.*

Supreme Court, Onondaga County, January 2, 1934.

---

* See, also, *People ex rel. Giallarenzi* v. *Munro* (150 Misc. 41).

*William C. Martin, District Attorney [William H. Bowers* and *Jesse Cantor, Assistant District Attorneys], for the plaintiff.*

*Richard J.* and *Paul R. Shanahan* for the defendant.

*Rosenberg & Aloi* for the witness Angella Carlucci.

CREGG, J. This is the return of an order to show cause why Angella Carlucci, a witness sworn on the part of the People, should not be directed to answer questions propounded her by the attorney for the defendant or why she should not be punished for contempt of court for her failure to so answer such questions; also to show cause why the district attorney should not be directed to answer whether immunity had been granted to or promised Angella Carlucci.

On March 5, 1933, Joseph Carlucci was murdered on what is known as the Thompson road in Onondaga county. As a result of such murder, Angella Carlucci, his wife, and the defendant in this case, Alfred Giallarenzi, were both arrested and are now in jail, charged with the crime of murder in the first degree. Angella Carlucci waived examination and is being held for the action of the grand jury. The defendant, Alfred Giallarenzi, who resides in the city of New York, demanded an examination.

During the examination before Magistrate Moses Waters, Angella Carlucci was brought in by the district attorney as a witness against the defendant, Alfred Giallarenzi. Mrs. Carlucci was represented by counsel and in reply to questions by the district attorney stated before she was sworn that she appreciated she was charged with murder in the first degree and that she was privileged to stand on her constitutional rights and refuse to answer any and all questions. She was also advised by the district attorney that anything she might say would be used against her on a criminal prosecution. She stated that she had not been promised anything in respect to immunity by the district attorney or any one else.

Mrs. Carlucci was then sworn and in answer to questions by the district attorney stated that she volunteered as a witness for the purpose of the examination. She then gave considerable evidence tending to connect the defendant, Alfred Giallarenzi, with the crime.

Inference can be drawn from her testimony that Alfred Giallarenzi and a man named Tony Mardello participated in the crime. She testified that she met the defendant and Tony shortly before the murder at her home; that she saw her husband and Tony driving

away in her husband's car and that Alfred followed in his car; that later Alfred returned to her home and informed her that Tony had killed her husband and at the same time he asked her for money to go back to New York.

The defendant also told her that he had followed Tony and her husband in his car; that he intended to pick Tony up but he did not do so because too many other cars came along at the time and he got frightened and left.

Upon cross-examination by Mr. Shanahan, Angella admitted that prior to the date of the examination she had had numerous talks with the district attorney and representatives of the sheriff's office in reference to the crime, but refused to answer when asked whether or not in those talks she informed the district attorney that she did not know anything about the murder. At that time her attorney stated that she stood on her constitutional privilege.

She refused to answer questions as to whether or not she had personally hired a room for the defendant to occupy at times when he was in Syracuse. She refused to answer whether or not she knew a woman by the name of Mrs. Graham. She refused to state whether or not the defendant herein was at her home in December prior to the murder, or whether or not she occupied a room with him, the defendant, on James street during that month. She refused to answer whether or not she was in the company of Tony at her house on December fourth or fifth prior to the murder, and refused to answer when she learned his last name. She refused to answer whether or not the defendant had rented a room on Willow street in Syracuse or whether or not she had occupied it with him. She refused to answer whether or not she knew her husband had met Tony before the night of the murder. She refused to answer whether or not she was implicated in an arrangement to kill her husband. She refused to answer whether or not Tony, Alfred and her husband had been drinking together before they went out. She refused to answer whether she cried, laughed or shook hands with Alfred when he informed her that Tony had killed her husband. She also refused to state whether or not she had had correspondence with Alfred since the date of the murder. She also refused to answer whether she had sent Alfred any money after the date of the crime. She did testify, however, that correspondence passed between them but refused to answer whether or not she had any of the letters. She also refused to answer a direct question as to how much she agreed to pay for the killing of her husband, and refused to answer the following question: "You won't deny that you paid any money to apply on the killing of your husband, will you?"

She also refused to answer in respect to any talk which she had

with the defendant prior to the murder of her husband. She admitted that she was out riding with Alfred the afternoon before the murder but refused to answer as to whether or not they drove over Thompson road and the exact spot where her husband had been murdered. She also refused to answer any questions concerning any and all conversations had between her and Tony or Alfred and herself on the afternoon prior to the murder. She also refused to answer concerning conversations which she had with the district attorney after the murder although she admitted that she had had several talks with him. She also refused to answer as to whether or not she talked with the defendant and Tony or either of them prior to the murder in reference to the killing of her husband.

During the course of the examination, Mr. Shanahan, attorney for the defendant, called Mr. Martin, the district attorney, and asked him in substance whether or not immunity had been promised the witness. He refused to answer.

The first question presented here is: " Should the district attorney be directed to answer the question as to whether or not he had promised the witness immunity?" In my judgment it is against public policy to compel a district attorney to take the stand and divulge openly his acts in the performance of his official duties.

The second question is: " Can Angella Carlucci be compelled to answer questions that may tend to incriminate her after she has voluntarily taken the stand and testified against the defendant, Alfred Giallarenzi, can she claim her constitutional privilege and refuse to give any testimony which might be beneficial to defendant if such testimony may in some way tend to implicate her in the crime charged against herself or any other crime?"

As to that proposition I can readily see the harm that may follow her refusal to answer questions upon cross-examination after she voluntarily took the stand and gave damaging evidence against the accused, on the ground that her answers may tend to incriminate her.

The Fifth Amendment to the Constitution of the United States in the Bill of Rights, adopted in 1791, says: " *No person * * * shall be compelled in any criminal case to be a witness against himself.*"

Those provisions of the United States Constitution were later incorporated into the Constitution of this State (Art. 1, § 6) and more recently incorporated in the Civil Practice Act and the Code of Criminal Procedure.

These constitutional and statutory provisions have long been considered the safeguards of *civil liberty and human rights.* They should be applied in a broad and liberal spirit so as to instill confi-

dence in our citizens and protect them against every specimen of self-accusation.

The right of a citizen to claim the benefits of these provisions has been frequently the subject of decisions in both the Federal and State courts. The principle established by these decisions is that no one shall be compelled in any judicial proceeding against himself or in any judicial proceeding between others in which he may be called as a witness, to disclose facts or circumstances that can be used against him as admissions or which may tend to establish his guilt in or connection with any criminal offense concerning which he is then charged or with which he may thereafter be charged, or to disclose the sources from which or the means by which evidence of his connection with such crime or crimes may be obtained.

These principles were first given definite sanction by Chief Justice MARSHALL in 1807 in the case of Aaron Burr,* wherein he said: " Many links frequently compose that chain of testimony which is necessary to convict an individual of a crime. It appears to the Court to be the true sense of the rule that no witness is compelled to furnish any one of them against himself. It is certainly not only a possible, but a probable case, that a witness by disclosing a single fact may complete the testimony against himself and to a very effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself would be unavailing, but all other facts without it would be insufficient. While that remains concealed in his own bosom he is safe, but draw it from thence and he is exposed to a prosecution. The rule that declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description."

It is an ancient principle of the law of evidence that a witness shall not be compelled in any proceeding to disclose incriminatory facts or to give testimony which may tend to incriminate him or subject him to fines or penalties.

Mr. Justice BRADLEY, writing the opinion for the court in the case of *Boyd* v. *United States* (116 U. S. 616), said (at p. 631): " Any compulsory discovery by extorting the party's oath or compelling the production of his private books and papers to convict him of crime or to forfeit his property is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power but it cannot abide the pure atmosphere of political liberty and personal freedom."

Mr. Justice BLATCHFORD, writing the opinion for the court in the case of *Counselman* v. *Hitchcock* (142 U. S. 547), said (at p. 574):

---

* Fed. Cas. No. 14,692e.

"This branch of the constitutional exemption corresponds with the common law maxim, *nemo tenetur seipsum accusare*."

I realize fully that Angella Carlucci voluntarily appeared and gave damaging testimony against the defendant, Alfred Giallarenzi. From first impressions it would seem that she had waived her constitutional protection and that she could be compelled to undergo a full and complete cross-examination and to answer all questions propounded by the defendant's attorney.

Yet I realize that it is just as necessary to guard and protect our citizens from self-incrimination today as it was in the days of Aaron Burr. At that time public sentiment was aroused through Burr's attempt to disrupt the Union.

Public sentiment is aroused today on account of the economic depression through which we are passing and we must preserve the confidence of our people in our system of government.

I do not believe that it makes any difference whether Mrs. Carlucci appeared voluntarily and subjected herself to examination or whether she was forced to appear through legal process. She had a right to claim her constitutional protection at any stage of the proceeding. She is the sole judge as to whether or not answers to questions propounded to her may tend to incriminate her. (*Travelers Ins. Co.* v. *Mulligan*, 231 App. Div. 222.)

I am not unmindful of the dictum in the *Cassidy Case* (213 N. Y. 388), where the court said (at p. 393): "It [the privilege] can be waived in any case by the person offering himself as a witness. When the privilege is so waived the person becomes subject to cross-examination the same as any other witness examined in the case."

In my opinion the court meant just what it said, that any one offering himself as a witness is subject to cross-examination, but it does not mean that on cross-examination he can be compelled to answer questions that may tend to incriminate him.

A different rule may apply where a defendant offers himself as a witness in his own behalf. It may be he then cannot refuse to answer questions that may tend to incriminate him. That question, however, is not here and need not be discussed.

It is claimed by the defendant that he has a right to inquire fully as to whether or not the witness has been granted immunity from the crime charged. On that proposition the witness testified that she had not been promised immunity of any kind. If she had, of course, she could not claim her constitutional protection, but before she could be compelled to testify it must appear that the immunity, if any, is such as to protect her against any possible prosecution for any crime concerning which her testimony may lead. (*Matter of*

*Doyle*, 257 N. Y. 244.) The evidence in this case is that she was not granted or promised immunity.

It is my opinion that Angella Carlucci cannot be compelled to answer the above-mentioned questions for the reason that the answer to any one of them may form the missing link in a powerful chain of circumstantial evidence against herself. Neither can the district attorney be compelled to divulge the secrets of his office.

Order may be entered accordingly.