In the Matter of Chester PRESTA, Petitioner,

v.

Arvid OWSLEY, Sheriff of Jackson County, Missouri, Respondent.

No. 23430.

Kansas City Court of Appeals.

Missouri.

April 12, 1961.

James A. Broaddus, Kansas City, for petitioner.

William Collet, Pros. Atty., Carrol C. Kennett, Asst. Pros. Atty., Kansas City, for respondent.

HUNTER, Presiding Judge.

In this original habeas corpus proceeding petitioner, Chester Presta, prays discharge from imprisonment in the county jail ordered by the Honorable Richard C. Jensen, Judge of the Criminal Division of the Circuit Court of Jackson County, Missouri, after adjudging the petitioner to be in contempt of court for refusing to answer questions propounded by a Jackson County Grand Jury before which he had been summoned. He asserts that the restraint of his liberty is unlawful and in violation of his right under Article 1, Section 19, of the Missouri Constitution 1945, V.A.M.S., to refuse to answer questions where the answers might tend to incriminate him; and that his denial of the presence of his counsel and of a public hearing at the time he was adjudicated to be in contempt invalidated the contempt order.

The setting in which the alleged contempt occurred is as follows: On March 17, 1961, Judge Jensen empaneled a Grand Jury for the March term of the Circuit Court, charging it, in addition to its statutory duty to investigate generally for evidence of commission of violations in Jackson County of state criminal laws, to pay particular attention to the organized criminal element. He advised the Grand Jury of his belief that there was a crime wave which was "a part of a national hook-up with the notorious hoodlum element of our country known as the 'Mafia'"; that there are "a series of burglaries and robberies, and assaults occurring in this county which seem so well planned and apparently well organized as to indicate an organized group of professional criminals preying upon our community"; to investigate possible connections between certain insurance companies that provide bail bonds to arrested persons "to determine what part they are playing in the planned program of organized crime"; and to investigate certain thefts of narcotics " * * * which were sold through the channels of organized crime".

Petitioner, Chester Presta, brother of a well known controversial Kansas City Politician, was summoned before the Grand Jury, sworn, and asked some questions which he apparently answered. He then was asked:

"Q. When was it that you sold your drug store? A. I refuse to answer that on the grounds it may tend to incriminate me.

"Q. I think that you answered that question. A. No, I did not.

"Q. Well, did you sell it prior to the time that you went into the real estate business? A. Yes, sir.

"Q. And you have been in the real estate business how long, sir? A. I think five or six years, or seven years, something like that.

"Q. Five, six or seven? A. No definite date. I couldn't give you a definite date. I would have to take a look at my broker's license and I can tell you when I first took it out.

"Q. It has been that many years? A. Yes.

"Q. It has been more than three years? A. Yes.

"Q. And do you think it probably has been more than five years? A. Yes, sir.

"Q. All right. Now, will you give us the date that you sold that drug business? A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. Who were your partners in the drug business? A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. How long did you hold the drug business? A. I was discharged from the Army in 1945. I think I opened it up in '46 and '47.

"Q. And the drug business that we are discussing is located where, sir. A. 1050 East 5th St.

"Q. Did you have any interest in the real estate that was subsequently sold to the Missouri Department of Highways for the Southeast Freeway here in Kansas City? A. What did you say?

"Q. Have (you) any financial interest? A. I refuse to answer on the grounds that it may tend to incriminate me.

"Q. Do you receive rental income from any property besides the property that you previously mentioned that your tenant was a liquor store? A. I refuse to answer on the ground that it may tend to incriminate me.

"Q. Do you know Nick Civella? A. I refuse to answer on the grounds that it may tend to incriminate me.

"Q. Do you know Carl Civella? A. I refuse to answer that on the grounds it may tend to incriminate me.

"Q. Do you know Anthony Civella? A. I refuse to answer that on the grounds it may tend to incriminate me.

"Q. Do you know Joe Guastello? A. I refuse to answer that on the grounds it may tend to incriminate me.

"Q. Do you know Louis Cangelose? A. I refuse to answer that on the grounds it may tend to incriminate me.

"Q. Do you know Nick Spero? A. I refuse to answer that on the grounds it may tend to incriminate me.

"Q. Do you know Charles Cacioppo? A. I refuse to answer on the grounds it may tend to incriminate me.

"Q. Do you know Felix Ferina? A. I refuse to answer on the grounds that it may tend to incriminate me.

"Q. Do you know Anthony Cardarella? A. I refuse to answer on the grounds it may tend to incriminate me."

After petitioner's refusal to answer the questions the record of interrogation was certified to the circuit judge, who advised the witness, Chester Presta, "that the questions asked were not self-incriminating and (not) a violation of his constitutional rights". The judge ordered petitioner to return to the Grand Jury room and to answer the questions. He returned to the Grand Jury room and again refused to answer the same questions on the ground that to do so would tend to incriminate him. Thereupon the Grand Jury, its reporter, the prosecuting attorney and petitioner returned to the circuit court room, from which all other persons, including petitioner's attorney and the representatives of the press, were excluded by the court. Upon being informed that petitioner still refused to respond to the Grand Jury's questions, the court adjudged petitioner to be in contempt of court and ordered him confined in the county jail until he purged himself of contempt by answering the questions.

Article 1, Section 19, of the constitution of this state provides: "That no person shall be compelled to testify against himself in a criminal cause, * * *." [1]

Specifically, petitioner contends that by virtue of the quoted state constitutional provision he was not guilty of contempt of court when he claimed his constitutional right and refused to answer the Grand Jury's questions for the reason that his answers would have tended to incriminate

---

1. The Fifth Amendment of the Constitution of the United States states: "No person * * * shall be compelled in any criminal case to be a witness against himself * * *."

him. Petitioner insists that the circuit court has exceeded its jurisdiction in adjudging him guilty of contempt and has deprived him of his liberty without due process of law.

■ This presents the clear issue—whether the answers demanded by the Grand Jury and ordered by the Court would tend to incriminate the petitioner, for it has long been settled that the constitutional privilege against self-incrimination—designed to prevent the use of legal process to force from the lips of any person the evidence necessary to convict him of a crime—is broad enough to protect the witness before any tribunal and in any proceeding, including Grand Jury investigations.

The problem presented is not new. It has several times been considered and ruled by the Supreme Court of the United States, by various federal courts and by the appellate courts of this state and other states.[2] In the Burr case, decided in 1806, 25 Fed.Cas. pages 38, 40, No. 14,692e generally followed by the courts, Chief Justice Marshall said: " * * * if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact. * * * It is certainly not only a possible but a probable case that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description. What testimony may be possessed, or is attainable, against any individual the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws."

In Ex parte Gauss, 223 Mo. 277, 122 S.W. 741, 742, the Supreme Court of this state approved the doctrine announced by Chief Justice Marshall in the Burr case, and held that such rule was entirely consistent with the doctrine generally held that when the court can say as a matter of law that it is impossible that the witness would incriminate himself by answering a question one way or the other, then the court can require an answer; but not otherwise. The court quoted with approval the following language from People v. Mather, 4 Wend., N.Y. 229, loc. cit. 252, 21 Am.Dec. 122: "The witness knows what the court does not know, and what he cannot communicate without being a self-accuser, and is the judge of the effect of his answer, and if it proves a link in the chain of testimony, which is sufficient to convict him, he is protected by law from answering the question. If there be a series of questions, the answer to all of which would establish his criminality, the party cannot pick out a particular one, and say, if that be put, the answer will not criminate him. If it is one step having a tendency to criminate him, he is not compelled to answer."

2. See, Ex parte Arvin, 232 Mo.App. 796, 112 S.W.2d 113; Ex parte Gauss, 223 Mo. 277, 122 S.W. 741; United States v. Burr, 25 Fed.Cas. page 38, No. 14,692e, 1 Burr's Trial 244; Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; State v. Young, 119 Mo. 495, 24 S.W. 1038; State ex rel. Attorney General v. Simmons Hardware Co., 109 Mo. 118, 18 S.W. 1125, 15 L.R.A. 676; Ex parte Carter, 166 Mo. 604, 66 S.W. 540, 57 L.R.A. 654; Ex parte January, 295 Mo. 653, 246 S.W. 241.

In Estes v. Potter, 5 Cir., 183 F.2d 865, 868, it was expressed: "If in the circumstances it is reasonable to infer the possibility of incrimination from the answers that the witness may give, the privilege may be claimed. It is for the court to determine, in the first instance, whether incrimination is reasonably possible from any answer the witness may give; but if such possibility exists, then the witness has the absolute right to assert his privilege, which extends to more than the admission of a crime or any element thereof. The privilege bars compulsory disclosure of any fact that tends to incriminate a witness."

In State ex rel. Attorney General v. Simmons Hardware Company, 109 Mo. 118, 18 S.W. 1125, 1126, 15 L.R.A. 676, Judge Barclay speaking for the Missouri Supreme Court said, "It is a reasonable construction, we think, of the constitutional provision that the witness is protected 'from being compelled to disclose the circumstances of his offense, the sources from which, or the means by which, evidence of its commission, or of its connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him' ".

This court has followed the principles laid down by the Supreme Court of the United States and the Supreme Court of Missouri. In Ex parte Arvin, 232 Mo.App. 796, 112 S.W.2d 113, decided in 1937, the question in this case was before the court. Arvin, the petitioner, had been called before a Grand Jury engaged in investigating the bombing of certain laundries and price fixing in the laundry trade. He refused to answer certain questions propounded to him on the ground that to do so would tend to incriminate him. There, as here, the circuit court committed petitioner to jail for contempt of court. We said in the Arvin case that the court cannot compel the witness to answer questions when he claims the constitutional immunity *unless the court can say as a matter of law* that those questions would not incriminate the witness. We stated that if an answer may

or may not incriminate the witness or might disclose a fact that would form a necessary and essential part of a crime, *the witness may decide whether or not to answer*. In deciding the case we ruled that under the existing and disclosed circumstances it could not be said as a matter of law that Arvin's answers to the Grand Jury's questions, if he had been forced to make them, would not have incriminated him or in some way have furnished a link in the chain of facts required to establish his connection with some criminal offense; and, therefore, that the circuit court erred and exceeded its jurisdiction in committing the witness to jail for his refusal to answer the questions.

It is necessary to have in mind several other established legal principles that apply in determining whether or not a particular question calls for an answer that may tend to incriminate the witness.

■ The burden of proof to show that the question asked calls for an answer that may incriminate him rests on the witness who is claiming the protection of the constitutional privilege. Thus if the particular question asked appears on its face to be innocuous the witness has the burden of showing that the answer might incriminate him. United States v. Weisman, 2 Cir., 111 F.2d 260(2); United States v. Emspak, D.C., 95 F.Supp. 1012; Annotation, Self-Incrimination Before Grand Jury, 38 A.L.R. 2d 248(7). However, constitutional rights are not to be denied through the exercise of an impractical judgment as to whether the question calls for an answer that may tend to incriminate the witness. The court in appraising the claim must be sensitive to the circumstances existing and perceptive in viewing the possibilities of incrimination. See, United States v. Fischetti, D.C., 103 F.Supp. 796, 799, and Cohen v. Superior Court of Los Angeles County, 173 Cal.App. 2d 61, 343 P.2d 286(6). The question must be viewed in the light of the setting in which it is asked and the witness before he can be adjudged to be in contempt

must be accorded an opportunity to show the setting and to suggest how or why the question is not innocuous. As stated in United States v. Weisman, 2 Cir., 111 F.2d 260, 262, "Obviously a witness may not be com-. pelled to do more than show that the answer is likely to be dangeorus to him, else he will be forced to disclose those very facts which the privilege protects." In Estes v. Potter, 5 Cir., 183 F.2d 865, 868, it is expressed, a witness "does not have to prove that his answers would incriminate him to be entitled to his privilege. * * * A witness need only show that his answers are likely to be dangerous to him. If in the circumstances it is reasonable to infer the possibility of incrimination from the answers that the witness may give, the privilege may be claimed." In Maffie v. United States, 1 Cir., 209 F.2d 225, 227, it is stated, "The privilege against self-incrimination serves as a protection to the innocent as well as to the guilty, and we have been admonished that it should be given a liberal application."

■ Turning to the questions asked Chester Presta, the first group would have required him to state precisely when he sold his drug store, "When he sold that drug business"; and "who were his partners in the drug business". Could the circuit court hold as a matter of law that these questions, viewed in the light of the circumstances under which they were asked, called for answers that would have no tendency to incriminate the witness? We think not. It takes but little reflection to see the possibility that the answers might give information helpful to establishing a criminal charge based on such things as violation of the state's income tax laws, participation in the illegal sale of narcotics; providing an outlet for stolen goods (fencing); etc. While the Sheriff in his reply states the Grand Jury was seeking information relating to persons other than the record owners who had financial interests in certain properties listed as assets by bondsmen in affidavits of qualification, and had information that Chester Presta had a financial interest in at least one of such properties, this is no assurance that the questions do not call for answers that might tend to incriminate Witness Presta in some manner in some state criminal law violation. The Grand Jury had the duty to investigate for violations in Jackson County of all of the state's criminal laws.

The next two questions required Chester Presta to state whether he had any interest in certain real estate sold to the State Highway Department or received rental income from any properties. Obviously, his answers might tend to incriminate him relative to state income tax laws and of other state criminal laws. These questions, viewed in their setting, cannot be ruled as a matter of law to call for answers that have no tendency to incriminate the witness.

The remaining questions can be grouped in the "Do you know so and so" class. The bare question, "Do you know ——?" on its face appears innocuous. However, the particular circumstances in which the question is asked may make a truthful answer incriminating. In Alexander v. United States, 9 Cir., 181 F.2d 480, 481, the witness was asked, "Do you know Ned Sparks?" This apparently innocent question in fact had deadly implications, for Sparks was an acknowledged communist leader believed to be seeking to overthrow the government by force and the witness feared he was under suspicion of being a communist party member. The federal appellate court held it impossible to say that in the light of the disclosed circumstances the answer to such a question might not be incriminating. In Marcello v. United States, 5 Cir., 196 F.2d 437, 439, the witness was asked, "Do you know Salvatore Vittali?" The federal court ruled that the apparently innocuous question in the light of the setting and circumstances under which it was asked was not in fact innocuous and that the witness was privileged

not to answer it.[3] In Maffie v. United States, 1 Cir., 209 F.2d 225, the witness was asked whether he knew "Specs" O'Keefe and Stanley Gusciora, and numerous other underworld characters. He was sustained in his claim of right to refuse to answer the question in view of the circumstance that such inquiry might lead to connecting him with certain crimes involving these others.

According to evidence before us in the habeas corpus hearing the nine men mentioned in the "Do you know" questions had a total of 333 arrests and 97 convictions, many for felonies including gambling, robbery, kidnapping and narcotic law violations. With the possible exception of Anthony Civella who is Carl Civella's son, according to the evidence these men bear the reputation of being gangster hoodlums and notorious members of the criminal element of this community. Who can say with assurance just what their criminal activities have been or are, and that an admission of knowing them might not be one of the links connecting this witness with some crime or some criminal conspiracy involving all or some of them. Nick Civella and Carl Civella have three charges of income tax evasion now pending. One of these nine men, Joe Guastello, at first refused to answer certain questions being asked of him by the present Grand Jury and was sent to jail for contempt for his refusal to answer. In order to purge himself of the contempt he then testified before the Grand Jury which promptly indicted him for the unlawful sale of intoxicating liquor on Sunday.

In this setting and under these circumstances it cannot be held as a matter of law that these "Do you know" questions do not call for answers that may tend to incriminate the witness. It is not perfectly clear from a careful consideration of all the circumstances in the case that the witness is mistaken and that the answers cannot possibly tend to incriminate him.

We are also presented with the question of the effect of the circuit judge's exclusion of the press, the public and the witness' attorney from the contempt proceeding.

■ We think it fundamental that a witness who has claimed the constitutional privilege and who has the burden of demonstrating that a question calls for an answer that may be incriminating must be granted an opportunity by the court to make a pertinent showing of facts and circumstances that bring him within the scope of the protection of the constitutional provision; otherwise the intended protection is wrongfully withheld. We believe it equally fundamental that the witness be accorded the right of the assistance of counsel when he undertakes the showing. Generally included in the right to any judicial hearing is the right to assistance of counsel during the hearing. 17 C.J.S. Contempt § 85, p. 117. Equally established is the general right of the public, including the press, to be present at the hearing.

Section 540.200, RSMo 1949, V.A.M.S., at least tacitly if not expressly recognizes these matters in providing that in Grand Jury investigations where a witness is unwilling to answer certain questions, "If the court determine that the witness is bound to answer, and he persists in his refusal, he shall be brought *before the court,* who shall proceed therein in the same manner as if the witness had been interrogated and refused to answer *in open court."* (Italics ours.) Section 476.170 RSMo 1949, V.A.M.S. provides, "The sitting of every court shall be public and every person may freely attend the same." See, also, Magerstadt v. La Forge, Mo.Sup., 303 S.W. 2d 130(2), (4), (9), (10).

■■ We appreciate the need for keeping the Grand Jury hearings secret and

3. See, also, Estes v. Potter, 5 Cir., 183 F.2d 865, 867; Kasinowitz v. United States, 9 Cir., 181 F.2d 632; United States v. Raley, D.C., 96 F.Supp. 495; United States v. Jaffe, D.C., 98 F.Supp. 191; United States v. Emspak, D.C., 95 F.Supp. 1012.

nothing we have said impairs that secrecy. If after the witness has had an opportunity in open court with the aid of his counsel to endeavor to demonstrate that he is entitled to refuse to answer a question the court judicially determines that he is not entitled to refuse to answer it, the witness should return to the Grand Jury room and there answer the question. He is not required to answer it in the public court room. Thus, all that is publicly revealed is the question; not the answer. There is no way to avoid revealing the question asked for there must be a judicial record of it in order to preserve the rights of the witness.

In the belief that it may be helpful to all concerned we set out below a generally approved procedure to follow to cite. a witness for contempt of court for refusal to answer questions before a Grand Jury:

## Procedure

I. The witness must be called before a legally constituted Grand Jury and placed under oath.

II. A pertinent question must be propounded to the witness by the prosecuting official or a member of the Grand Jury.

III. The witness must refuse to answer the question on the ground that an answer would tend to incriminate the witness.

IV. The Grand Jury, the prosecuting official and the witness (with his attorney, if he has one) shall come before the Court in open session.

V. The Foreman of the Grand Jury (or the prosecuting official) must inform the court of the matters set forth in paragraphs I through III above, and ask the advice and assistance of the Court in connection with the privilege claimed.

VI. The Court hears the question which the witness has refused to answer.

VII. The Court makes certain that the witness understands the question that has been put to him. (If the witness does not understand the question, it must be reframed so that there is no doubt that he does understand it.)

VIII. The Court then proceeds to consider the bare question, which the witness has refused to answer, and determines whether or not, from the face of the question, an answer could, in fact, tend to incriminate the witness.

IX. If the question does not, on its face, disclose that an answer would tend to incriminate, the witness is then given an opportunity to be heard (and to be aided by his attorney if he has one); and, if it is desired, to introduce any relevant evidence which substantiates the claim that from the implications of the question, in the setting in which it is asked, there is a real and appreciable danger that the answer would be dangerous because an injurious disclosure might result from it

X. If, after a consideration of the question in the light of the evidence adduced, and other relevant facts, circumstances and surroundings, and the applicable law, the court is satisfied that an answer would not tend to incriminate the witness, the court then rules that the privilege may not be validly claimed and directs the witness to return to the Grand Jury room and answer the question.

XI. Should the witness continue to refuse to answer the question, this fact is reported to the court in open session with the Grand Jury, the prosecuting official and the witness (with his attorney, if he has one) present.

XII. The court again hears the question as in step VI, supra.

XIII. The court then, in the presence of, and on behalf of the Grand Jury, puts the question to the witness and inquires:

A. If the witness understands the question;

B. If the witness understands that the court has ruled that the privilege

against self-incrimination may not be validly claimed for that question, and the court has ordered him to answer it.

C. If the witness has given all the reason that he has for his refusal to answer the question; and

D. If the witness still refuses to answer the question as directed by the court.

XIV. If the witness affirmatively answers each of the four questions set forth in paragraph XIII, supra, the witness has committed a contempt in the presence of the court. The court may then certify it saw and heard the conduct constituting such contempt, and may proceed to punish the witness.

See, Layman v. Webb, Okl.Cr., 350 P.2d 323; In re Hitson, D.C., 177 F.Supp. 834, 837.

The suggestion is made that Witness Presta waived his constitutional privilege against self-incrimination. Our examination of the record before us does not indicate any merit to that suggestion.

It is a matter of regret that constitutional rights are most frequently upheld for the benefit of those who seem least deserving of their protection. But constitutional rights are not dispensations granted only to the good. They are fundamental rights possessed by all. They afford protection to the law violator as well as to the law abiding citizens. This is the recognized price our forefathers were willing to pay when our Constitution was enacted and which we have preserved. While the privilege is subject to abuse and misuse it is firmly embedded in our constitutional and legal frameworks as a bulwark against iniquitous methods of prosecution through compulsory disclosures. It is the duty of the courts to follow and enforce the provisions of the Constitution.

For the reasons stated, the order adjudging the petitioner in contempt is hereby quashed and annulled, and the petitioner is ordered discharged.

HUNTER, P. J., and CROSS, J., concurring.

BROADDUS, J., not participating.