LEIGH M. CLARK, Retired Circuit Judge.
Appellant was convicted of rape and sentenced to imprisonment for life.
He was indicted under the name of “Jerry James Hill, alias Jerry James Hall.” The evidence shows without dispute that his name is Jerry James Hall. There is no evidence that he was ever known by the name of Jerry James Hill, but no contention is made that such fact furnishes a basis for a claim of prejudicial error. This accords with the rule that where an accused is indicted under two or more names connected by “alias,” such an averment is supported by evidence that he was known or called by any one of the names. Evans v. State, 62 Ala. 6 (1878); Harris v. State, 19 Ala.App. 484, 98 So. 316 (1923); Tucker v. State, 43 Ala.App. 163, 184 So.2d 366 (1966); 42 C.J.S. Indictments and Information § 258.
According to the testimony of the alleged victim of the crime, a young married woman, she went to Sears Store in downtown Birmingham on December 29, 1975, about 6:30 P.M., parked the automobile she was driving in Sears parking lot, but did not lock the passenger’s side of the automobile because it had been damaged to such an extent that it could not be locked. After finishing shopping, she returned to the *251 automobile and drove off. Shortly after she left the parking lot, a man came up from the rear floor board and ordered her to drive to a cemetery near Fountain Heights, on the outskirts of downtown Birmingham. Upon arriving at the cemetery, the victim was ordered by the man to hand over her purse and rings; he then commanded her to go to the Fountain Heights Recreation Center, where he raped her, after she had pleaded with him not to do so. Thereupon, the attacker fled on foot and disappeared over a nearby hill. The victim testified positively that the man, previously a stranger to her, was the defendant.
Soon after the victim arrived at her home and notified her husband what had happened, her father-in-law drove the automobile from the victim’s house to the garage of the Birmingham Police Department, where it and its contents were examined for fingerprints and palm prints. By the testimony of expert witnesses, it was shown that the palm print lifted from one of the “articles" which, according to the victim’s testimony, had been in the automobile “a week or so,” matched a known palm print of defendant.
There was other evidence to corroborate the victim’s testimony as to sexual molestation, the force applied, the lack of consent by the victim, and the identity of defendant, but the above suffices to disclose that a jury issue was presented as to his guilt. No contention to the contrary is made by appellant, and we see no need to go into further details as to the evidence, except to state that defendant did not testify and there was evidence presented by him tending to show an alibi.
Defendant was indicted on July 21, 1976, but was not apprehended until June 14, 1977, under circumstances stated by Sergeant Albert Wallace, a detective in the Homicide Division of the Birmingham Police Department, in part as follows:
“Q Back on June 14, 1977, did you have occasion to arrest the defendant in this case, Jerry James Hall, or Hill, in connection with this ease?
“A Yes, sir.
“Q Do you recall where that arrest took place?
“A Yes, sir. It was on Fourteenth Avenue and Nineteenth Place North.

“Q . . Was he alone or was he with some other people?
“A He was with some other people.
“Q How many other people?
“A Three or four.
“Q On that occasion, prior to the arrest, did he go somewhere?
“A I don’t understand.
“Q Did you arrest him when you first saw him, or did you arrest him somewhere else?
“A I arrested him at the City Hall.
“Q When you first talked to him was it there or somewhere else?
“A It was at the scene where I stopped him.
“Q Did you stop him at the place you first saw him?
“A No, sir.
“Q O.K. How did he get from the place you first saw him to the place you stopped him?
“A He was in an automobile.
“Q And where were you?
“A I was behind him.
“Q Were you in an automobile?
“A Yes sir.
“Q And how far did you go before you stopped him?
“A I would say six or seven blocks.
“Q When you stopped him were there some other people in the automobile?
“A Yes, sir.
“Q Was the defendant driving the automobile?
“A No, sir.
“Q Where was the defendant seated in the car?
“A He was sitting on the passenger’s side.
“Q When you stopped the automobile, was there a patrol car also present?
“A Yes, sir.
“Q Was the patrol car — where was it in relation to the car the defendant was in?
*252 “MR. PURVIS: Judge, I think at this time I’ll object. We probably need a hearing, may it please the Court.”
Thereupon the court conducted a hearing out of the presence of the jury. Upon return of the jury to the jury box, the testimony of Sgt. Wallace continued:
“Q Sgt. Wallace, on the occasion you have testified about previously when you stopped the defendant, did you say anything to him?
“A Yes, sir.
“Q What did you say to him?
“MR. PURVIS: We object.
“THE COURT: Overruled.
“MR. PURVIS: We except.
“A Ask him who he was.
“Q And what did the defendant say to you?
“MR. PURVIS: Object.
“THE COURT: Overruled.
“MR. PURVIS: Can I have a continuing objection?
“THE COURT: Yes, sir. What did' he say?
“THE WITNESS: He said his name was Clarence Jones.
“Q Did you then say something else to the defendant?
“A Yes, sir.
“Q What did you say to him?
“A I told him I would take him to City Hall and fingerprint him and compare his prints with Jerry Hall’s to see if it was him.
“Q And at that time did he say something to you?
“A He told me he was not Jerry Hall. “Q At that time did you take the defendant into custody?
“A Yes, sir.

A major insistence of appellant is that in allowing the State to show that as Sergeant Wallace interrogated the defendant, upon stopping the automobile in which defendant was riding, as to who defendant was and receiving an answer by defendant that “he was Clarence Jones” and that “he was not Jerry Hall,” without prior instructions and warnings as to his Constitutional rights to an attorney and to be protected against self-incrimination, is in conflict with what was held in Miranda v. Arizona, 384 U.S. 436, 87 S.Ct. 1602, 16 L.Ed.2d 694 (1965).
There seems to be little disagreement between the parties that the solution to the issue hinges on whether the particular question was asked and defendant’s answer was given while he was undergoing police custodial interrogation so as to make the statements of an accused inadmissible against him unless all phases of the Miranda predicate are firmly laid.
The proliferation of the problems that arose within three years after Miranda on the single part thereof, the one dealing with the matter of what constitutes an in-custody interrogation, is plainly noted in the existence of one hundred and thirty pages of citations, quotations from cases and comments in Annotation, Custodial Interrogation, 31 A.L.R.3d 565-696. Even so, we find few, if any, authoritative cases that can be said to be conclusive on the particular issue now before us, and the parties have brought none to our attention. Harrison v. State, Ala., 358 So.2d 763, Rev’g Ala.Cr.App., 358 So.2d 759, chiefly relied upon by appellant, helps neither appellant nor appellee. The case did involve the question of the admissibility of evidence that defendant gave a name different from his own in answer to an officer’s question, but the axis on appeal was whether the point had been sufficiently raised in the trial court, and the Supreme Court held that it was. The conclusion that the interrogation was custodial was largely based on express testimony of a witness for the State that he “took them [including defendant] into custody” before the interrogation and the position taken by prosecuting attorney on the trial that defendant was “under custodial interrogation.” We have no similar support for such a conclusion here.
Countless progenies of Miranda involve problems that seem to have no end as to the applicability of the express exception to the exclusionary mandate of the authority to be *253 found in general “on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process.” The author of the A.L. R.3d Annotation, supra, has helpfully categorized the various places of police interrogations and labeled one category as “On the street” interrogation. The list of cases cited, some holding that the particular interrogation was in-custody and some that it was not, demonstrates the unanimously recognized principle that the place at which the interrogations was made does not in and of itself determine whether it was custodial. However, the variety of circumstances of on-the-street interrogations tends to narrow the search for precedents in a case in which an on-the-street interrogation is under consideration, which is true here.
Without attempting the virtually impossible task of citing and discussing the multitudinous reported cases on the subject, which doubtless even today continue their incessant flow, we find much in favor of the admissibility of the testimony, and little, if any, to the contrary.
In United States v. Gibson, 392 F.2d 373 (4th Cir. 1968) the interrogating officer had received an anonymous tip that a certain person was driving a particular described automobile which the informant believed had been stolen. The tip was partly corroborated by a report that the vehicle had been lost or stolen. The officer located the automobile parked in front of a tavern, entered the tavern and asked the defendant customer to step aside. Upon his doing so, the officer asked defendant several questions, including where he lived, where he worked, and whether he owned the automobile. In holding that the interrogation was not custodial, the court said:
“. . Thus, our present task is to determine whether the atmosphere surrounding the brief police questioning on the sidewalk near the car was characterized by ‘official overbearing’ or ‘overzealous police practices’ which, as the Court pointed out, could preclude the individual’s making a rational decision whether to speak to the police or remain silent.
“This Court does not read Miranda as requiring officers to preface with a warning all non-coercive questioning conducted in the course of a routine investigation as in the circumstances of this case. See Allen v. United States [129 U.S.App.D.C. 61], 390 F.2d 476 (D.C. Cir. 1/25/68). Not until the suspect has been taken into custody or restrained in a significant way do the Miranda requirements attach.
“The uncontroverted evidence indicates beyond doubt that Gibson, at the time of the conversation, was not in custody or significantly restrained, or in any other way deprived of his free will. Trooper Greathouse simply asked Gibson to step to the sidewalk, and pointing to the car parked in front of the premises, asked him if it was his. At first denying ownership, Gibson quickly reversed courses and, without any pressure from the officer, voluntarily produced the document intended to prove his ownership. It was at this point that Greathouse noticed the alterations which led him to check further with the Indiana authorities. When Gibson was asked if the car belonged to him, the trooper knew only that the license tags had been ‘lost or stolen,’ and that the car might have been stolen. In the then amorphous situation, inquiry was indicated but not enough was known by the officers to conclude that the car had in fact been stolen, or that Gibson was the guilty party. When the police talked with him on the sidewalk they seemingly had not formed an intention to arrest him. Even after the voluntary production of the altered document the officers apparently did not feel that the situation warranted his arrest for stealing the vehicle.
“Gibson, who took the stand, offered no different version. In the complete abT sence of the element of coercion, actual or potential, or police dominance of the individual’s will, the mild police activity shown here should not prevent the introduction of statements freely made. The evils with which the court tims concerned in Miranda are not present here. Nor do we perceive in the record any element of *254 accusation, deception, suggestion, or other tactic calculated to overawe, like those condemned in Miranda, supra, 384 U.S. at 448-456, 86 S.Ct. 1602. Significant in the instant case are the short duration of the questioning, which lasted no more than a few minutes; the very casual, reasonable and routine manner in which it was conducted; and in the absence of any apparent purpose either to force or to trick the suspect into an admission of guilt.”
In People v. Milligan, 107 Ill.App.2d 58, 245 N.E.2d 551 (1969) a police officer saw a man about one-half of a mile from the home of one whose house had been burglarized. The man fit the description of the burglar given the officer by the homeowner. The officer asked the man what he was doing in the vicinity and how long he had been there. When the suspect finished answering the officer’s questions, the officer said, “Well, we will go up there and see if the man can identify you.” The man so interrogated was the defendant. The court held that the interrogation was not custodial.
In Kwok T v. Mauriello, 43 N.Y.2d 213, 401 N.Y.S. 52, 371 N.E.2d 814 (1977), the on-the-street interrogation by an officer of a suspect was held to have been out of the area of custodial interrogation denounced by Miranda if not preceded by Miranda requirements. In Kwok T, the court said:
“Certainly, in a brief street encounter in which the police suspect an individual of some criminal activity, it should not be required that warnings be given before questions are asked. To do so would unnecessarily hamper the ability of the police to thwart criminal activity. The need for allowing police a certain degree of latitude in this area is amply demonstrated in the present case.” 401 N.Y.S. 52, 55, 371 N.E.2d 814, 817
Perhaps the clearest beacon furnished by Miranda as to our duty in this case is the following:
“The privilege [against self-incrimination] was elevated to constitutional status and has always been ‘as broad as the mischief against which it seeks to guard.’ Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110, 1114 (1892). We cannot depart from this noble heritage.” Miranda, 384 U.S. at 459-460, 86 S.Ct. at 1620, 16 L.Ed.2d at 715
The conduct of Sergeant Wallace was exemplary and utterly free of mischief. Assuming that he could legally have accused and arrested appellant on the spot, without asking him a question, such action would not have been as consonant with propriety as was that which actually occurred. Even though there is testimony that the officer knew the appellant and recognized him when he first saw him in the automobile, the officer knew, as every human being knows, that at times persons are mistaken for others. Pew there are, if any, that have not thought occasionally that a person observed by them was someone else, until, by asking the person observed, the belief was shown to be erroneous. We feel that, under the circumstances presented, the officer was on high ground in asking appellant who he was. To rule that officers should not be allowed to ask suspects such a question would not serve in any way to prevent mischief but would result in major mischief and evil to law enforcement authorities and suspected criminals alike.
The court was not in error in admitting in evidence the statement of defendant as to who he was.
Appellant urges reversible error in the action of the trial court as shown by the following portion of the record:
“(Whereupon, Mr. Black continued to address the jury, during which the following proceedings were had and done:)
“MR. BLACK: Mr. Holmes on this jury, sitting on the back row there.
“MR. PURVIS: We object.
“THE COURT: Overruled.
“MR. PURVIS: We object, if it please the Court, to him pointing someone out on the jury.
“THE COURT: I said overruled.
“MR. PURVIS: We except.
“(Whereupon, Mr. Black continued to address the jury, there being no further objection or exceptions taken thereto).”
*255 We said in Atchison v. State, Ala.Cr.App., 331 So.2d 804, cert. denied Ala., 331 So.2d 806 (1976):
“It is not permissible to single out a juror or jurors in argument and appeal to their fears or prejudices. In Little v. State, 18 Ala.App. 98, 89 So. 303, the former Court of Appeals said:
‘[Further] The court, in ruling on an objection to the remark of the solicitor, said: “Yes, it is no difference how any individual juror feels or would like to be treated. You can argue the effect it would have on society,” etc. This was entirely proper. It is the duty of the court to direct the trial and to keep the argument of counsel.within legal rules.’
“[And then] Also see The Alabama Lawyer, Vol. 33, p. 222.”
The record shows that immediately after the oral charge of the court and the submission of the case to the jury the following occurred:
“THE COURT: Let me say this, for the record. During the closing arguments, it’s been brought to my attention that Mr. Black’s pointing out reference to somebody was a juror. I had no idea that you were talking about a juror, Mr. Black. I didn’t know who Mr. Holmes was. He tried mighty hard to get the case mistried, mighty hard. I think that it’s improper, and I would have sustained the objection. I don’t think what was said necessarily requires — if you want me to say anything about that, Mr. Purvis?
“MR. PURVIS: No, sir.
“THE COURT: But I would have sustained the objection had I known that. I did not know that he was talking about the man on the back row within the jury box.”
We cannot tell from the record that the reference by the prosecuting attorney to the individual juror Mr. Holmes constituted an “appeal to . fears or prejudice,” but it appears that the trial court, after becoming cognizant that State’s counsel had singled out a juror during his argument to the jury, gave defendant’s counsel adequate opportunity to invoke a ruling of the court that would have eradicated any injury to defendant by reason of the argument and the overruling of the defendant’s objection to the argument. In this circumstance, we cannot predicate error upon the action of the court as a whole relative to the argument.
Appellant complains of what took place during the following part of the redirect examination of Sergeant Knight:
“Now, Sgt. Knight, referring to the statement which you have testified about previously here today that you took from the defendant Jerry James Hall, the taped statement taken on June 15, 1977, at the County Jail?
“A Yes, sir.
“Q I ask you if on that occasion, on page 2, some questions and answers.
“MR. PURVIS: If we are going to go into page 2 then I think the other is admissible from the beginning, may it please the Court.
“THE COURT: I only looked—
“MR. PURVIS: I’m talking about the first two.
“MR. BLACK: If you want to introduce the whole statement that’s fine with me.
“THE COURT: No, Mr. Black, we don’t want to do that. Do they refer to the portion that I read?
“MR. BLACK: No, sir.
“THE COURT: You have already asked that.”
At the conclusion of the evidence and at the beginning of a recess for the jury for the night, counsel for defendant said:
“For the record, I want to make a motion for a mistrial at this time on what Mr. Black said about mentioning his statement, trying to put it in evidence. The Court, District Attorney and Defense Attorney has been over this statement many times. He knew at the time there were statements about being on probation, other things being said; highly improper. It’s left in the minds of this jury. I don’t think it can be eradicated, the fact that we are trying to hide something.
“THE COURT: You didn’t object to it. I objected to it.
*256 “MR. PURVIS: Yes, sir, I know, but it appeared to the jury — I mean, is not cleared up in the jury’s mind, and I want to make that motion at this time.
“THE COURT: Overruled.
“MR. PURVIS: We except.
“THE COURT: That was, and don’t ever do that again in the presence of a jury in this courtroom.”
Although the record is not altogether clear to us, it appears that the trial court reprimanded State’s counsel for an attempt to prejudice the defendant in the eyes of the jury, as claimed by defendant’s counsel. However justified the reprimand was, we do not think counsel for the State succeeded in causing any substantial injury to defendant. As no timely objection was made to the conduct of the prosecuting attorney and as the circumstances did not justify, in our opinion, a mistrial, we find no error prejudicial to defendant in the matter.
In a short argument appellant contends that the in-court identification of defendant by the alleged victim should have been suppressed. The evidence does not support the argument. It shows that the witness had ample opportunity to observe, and did observe, defendant, particularly while he was in the rear seat of the automobile, through the rear view mirror. She described him accurately and positively. Furthermore, there was nothing unduly suggestive in the conduct of the investigating officers that tended in any way to taint the victim’s identification of defendant. Our attention has not been called by appellant to any particular phase or phases of the evidence that would substantially discredit the identification of defendant by the victim.
We have examined the record for error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.